[No. B233401. Second Dist., Div. Three. Mar. 22, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL MECANO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV. and V. of the Discussion.

1062

**COUNSEL**

Law Offices of William J. Kopeny and William J. Kopeny for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer, Joseph P. Lee and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ALDRICH, J.—**

## INTRODUCTION

A jury found defendant and appellant Russell Mecano, a police officer, guilty of solicitation of prostitution, sexual battery by restraint, sexual penetration by force or duress, and sexual penetration under threat by a public official. In the published portion of this opinion, we consider and reject Mecano's contention that because he never explicitly requested sex for money, there was insufficient evidence to support his conviction of solicitation of prostitution. We find that Mecano's words, coupled with his overt acts, constituted sufficient evidence of the crime. In the unpublished portion of this opinion, we reject his remaining challenges to his conviction. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

I. *Factual background.*

 A. *Prosecution case.*

 1. *Taylor P.*

On October 20, 2007, Taylor P. was 18 or 19 years old and homeless, living on the streets of Santa Monica with her boyfriend, Eric A. That night,

Taylor slapped a woman who approached Eric. Los Angeles Police Officers Mecano and James Matthews arrived. Mecano told Taylor she was in a lot of trouble, but he could help her out. Unsure what to think about what Mecano said, Taylor thought he was flirting with her and wanted to have sex.

Along with their bikes, Taylor and Eric were taken to the West Los Angeles (West L.A.) police station. While Taylor was alone in a holding cell, Mecano told her she would be charged with battery, but he could get her out of a bad situation and get her "O.R'd" (released on her own recognizance). He told Taylor, however, she would owe him.

Officers Matthews and Mecano transported Taylor to Pacific Division Station for booking. After Taylor was booked, she was alone with Mecano in the patrol car, although Officer Matthews, who was doing paperwork, would come and go. Mecano asked Taylor, in a "flirting kind of way," where she lived and how he could find her. She told him she lived behind the wall on one side of "Meth Mountain" in Santa Monica. Mecano said that Taylor's boyfriend was not good enough for her, and she should be treated better. Mecano would take her out, "wine and dine" her, and treat her right. Not wanting to ruin her chances of being released, Taylor went along with him.

Although Eric remained detained based on warrants, Taylor was released on her own recognizance. Back at the West L.A. station, Mecano ordered a cab for Taylor about 1:30 a.m. and gave her $200 in crisp $20 bills, saying he would be "fucking pissed" if she "burn[ed]" him for the money. He told her to go to a nearby Holiday Inn, to give his name to someone at the front desk, to get a room, and to take a shower and to wait for him. He would come after his shift to see her. Although Mecano did not say why he was coming to the motel, Taylor thought it was to have sex with her.

When the taxi arrived, Taylor told the driver to take her to the beach. The cabdriver, Narbey Savadian, testified that Taylor was upset. She told him that the "policeman" gave her money and she was supposed to go to the Holiday Inn. She was afraid of the policeman, who she thought was following them. Savadian assured her they were not being followed. After having Savadian take her to Pacific Coast Highway, Taylor hid from a person with a flashlight, thinking it was Mecano looking for her.

Mecano called the taxicab company four times in the early morning to ask for Taylor's final destination. He was told that the driver would call him. When the driver did not call him, Mecano called the taxicab company again and said he needed an "exact address where she's gonna end up staying." The next day, someone identifying himself as a policeman called Savadian and

asked if he had dropped off the girl where he was supposed to. Savadian told the caller he had taken Taylor to Pacific Coast Highway.

Taylor told two officers what happened to her. Homeless Liaison Officer Jacob Holloway testified that Taylor told him an Asian sergeant[1] released her and gave her $200 to go to a hotel, where she should take a shower. This "sergeant" warned Taylor not to burn him. Officer Holloway told Taylor to report the incident.

Sergeant Joy Smith testified that, on March 16, 2008, Taylor told her that Mecano said he could get her "O.R'd," but she would "owe" him.[2] He gave her $200 in $20 bills and ordered a cab for her, telling her to go to the Holiday Inn up the street. He would meet her there when his shift was over at 6:00 a.m. Mecano told her she was good looking and he wanted to be with her. After being dropped off at the beach, she saw Mecano with a flashlight. Taylor knew it was him because he was "Asian looking," and she knew his voice.

### 2. *Alexandria H.*

On the evening of May 28, 2008, Alexandria H. (Alex), then 18, was at Palisades Park with Jacob Colman (Colman), Ben W., Audrey L., and Anna F. Audrey, Anna, and Ben were minors. Some members of the group were smoking marijuana. When Officers Matthews and Mecano arrived, Colman was arrested.

Needing a female officer to search the minor girls, Mecano called for additional officers. Officers Alan Parra and Georgina Villalobos arrived, and Villalobos searched Audrey and Anna. Villalobos handed a purse to Mecano, who walked away with it. According to Officer Parra, Mecano threw marijuana he found in the purse into a trash can. Officers Parra and Villalobos left, taking the two minor girls with them. At some point, Ben left with his mother.

Mecano asked Alex what was going on, and she told him she had a marijuana pipe and marijuana. Mecano found the pipe in her purse, but he left it there. She gave him her driver's license, which had a restriction. Mecano told Alex she was responsible for the minors' actions and that her car could be impounded.

Mecano repeatedly asked what Alex would do if he let her go. When Alex answered she was just telling the truth, Mecano blatantly asked if she would

---

[1] Mecano is Filipino.

[2] The sergeant recorded her conversation with Taylor.

hook up with him if he let her go. Terrified, Alex said yes, maybe. He asked if she had money to meet him at a hotel when he got off his shift at 6:00 a.m., and he mentioned several places they could meet, including the Holiday Inn. Although Alex indicated she would go along with Mecano, she never intended to meet him.

Saying he wanted to know if she was "for real," Mecano walked Alex towards a building, adding that he could "tell the good ones from the bad ones."[3] With Alex's back against a wall, Mecano kissed her. He put his hands up her shirt and touched her breast. He unzipped her pants and put two fingers into her vagina. To stop him, Alex put her hands on his chest, saying they could do this later. Mecano told Alex he would keep her driver's license until she met him at the hotel. She wrote her cell phone number on a white card for him, and he gave her his phone number, which she wrote on her hand. Without having been given any citation, Alex left.

Crying, she called Ben and told him that she had let Mecano do things to her, and she felt dirty. Alex called 411 for the telephone number for the Pasadena Police Department and, after calling that number, told a Pasadena police officer that she just had an "incident" with a police officer, "Rusty," in which he let her "off," and "bribed me with sex." She told the Pasadena officer, "[h]e wants to meet me at a hotel room at 6:00 in the morning." Alex also called her mother and told her what happened. While talking to her mother, someone tried to call her, but she did not answer it because she thought it was Mecano. She answered it once and it was Mecano, who had also left her a voice mail message.[4] She told him she was on her way home. When Alex got home, her mother was on the phone with the police department. Alex told the watch commander that an officer named Rusty or Russ assaulted her. Several hours later, detectives arrived at her house and she told them what happened.

That same night, swabs were taken from Alex for DNA testing. Swabs were also taken from Mecano's hands. A DNA profile was obtained from his right hand, and Alex could not be excluded as a minor contributor to the DNA mixture. The probability of randomly selecting a Caucasian who fit that profile was one in 8,842. Swabs from Mecano's police car contained a mixture of at least three, most likely four, people. Alex and Mecano could not be excluded as potential contributors to the mixture. In the Caucasian population, the probability of randomly selecting an individual and being able to include them in the mixture was one in 1,328.

---

[3] Colman, who was handcuffed in the back of the police car, saw Mecano walk with Alex toward a trash can until they passed out of view. They were gone for about 10 minutes.

[4] Phone records showed that Mecano called Alex a total of four times between 12:30 and 1:00 a.m.

B. *Defense case.*

Anna testified that she was at the park that night to hang out and smoke. Although she did not go to the park to sell marijuana and did not recall anyone discussing buying or selling marijuana that night, she and Audrey had, in the past, pooled money to buy drugs. She saw Mecano walk away with Audrey.

Ben initially testified that everybody at the park smoked except him and Alex, and he tested negative for drugs. Then Ben admitted that he smoked marijuana at the park and faked his drug test. After he left the park that night, Alex called him. Crying, she told him an Asian officer kissed her and wanted to meet her at 6:00 a.m.

Mecano testified. With respect to the May 28, 2008 incident, Alex told Mecano she did not want to go back to "rehab." Mecano did tell Officer Parra that Audrey had some "shit" in her purse and, feeling that Audrey was in enough trouble due to curfew, he advised her to throw it away. Mecano admitted walking about 60 feet with Alex, but only because she wanted to tell him something. They exchanged phone numbers because Alex wanted to tell him over the phone. After Alex left the park, Mecano called her to follow up.

As to the October 20, 2007 incident with Taylor, when Mecano first came into contact with her, he merely told her why she was being arrested. He transported her to the West L.A. station, where he advised the watch commander that Taylor was eligible for release on her own recognizance. He went to Taylor's holding cell to clear up what would be in the report. After Taylor was booked at Pacific Division Station, Mecano's partner went into the station to retrieve some papers, leaving Mecano alone with Taylor. Mecano did not tell Taylor he wanted to date her, wine and dine her or have contact with her after her release. Instead, Taylor told him she was homeless, she lived at Meth Mountain, and she was a "cutter."

When they returned to the West L.A. station and Taylor was getting ready to go, she became upset because one of her bikes was damaged. To avoid an altercation with her, Mecano called a taxi and withdrew from the station's ATM $200, $40 of which he gave to Taylor for the taxi fare. Taylor asked where she should go, and he told her she could go to the Holiday Inn. He did not tell her to take a shower at the motel and to wait for him. He did not go to Meth Mountain to find Taylor. He called the taxicab company and driver because he wanted to get more information from Taylor about Meth Mountain.

## II. *Procedural background.*

On March 14, 2011, a jury found Mecano guilty of count 1, misdemeanor solicitation of prostitution of Taylor (Pen. Code, § 647, subd. (b));[5] count 2, sexual battery by restraint on Alex (§ 243.4, subd. (a)); count 3, sexual penetration by force or duress on Alex (§ 289, subd. (a)(1)); and count 4, sexual penetration under threat by public official on Alex (§ 289, subd. (g)).

On May 26, 2011, the trial court, after denying Mecano's new trial motion, sentenced him on count 3 as the base term to eight years and to a consecutive six-month term on count 1. The court imposed a concurrent sentence of four years on count 2 and imposed but stayed under section 654 a sentence of eight years on count 4.

## DISCUSSION

### I. *There was sufficient evidence to support Mecano's conviction of solicitation of prostitution.*

Based on the absence of an explicit request of sex for money, Mecano challenges his conviction of soliciting Taylor for prostitution. We hold that Mecano's words, placed in context and coupled with his overt actions, constituted sufficient evidence of the crime.

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio*

---

[5] All further undesignated statutory references are to the Penal Code.

(2008) 43 Cal.4th 327, 357 [75 Cal.Rptr.3d 289, 181 P.3d 105]; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

Every person who solicits or who agrees to engage in or who engages in any act of prostitution is guilty of disorderly conduct, a misdemeanor. (§ 647, subd. (b).) "A person agrees to engage in an act of prostitution when, with specific intent to so engage, he or she manifests an acceptance of an offer or solicitation to so engage, regardless of whether the offer or solicitation was made by a person who also possessed the specific intent to engage in prostitution. No agreement to engage in an act of prostitution shall constitute a violation of this subdivision unless some act, in addition to the agreement, is done within this state in furtherance of the commission of an act of prostitution by the person agreeing to engage in that act." (*Ibid.*) "[A]*ll persons*, customers as well as prostitutes, who solicit an act of prostitution are guilty of disorderly conduct." (*Leffel v. Municipal Court* (1976) 54 Cal.App.3d 569, 575 [126 Cal.Rptr. 773].) To establish that a defendant committed the crime of solicitation, the People must prove that (1) the defendant requested or solicited a person to engage in an act of prostitution and (2) the defendant intended to engage in an act of prostitution. (CALCRIM No. 1154.)[6]

To be guilty of the crime of solicitation under section 647, subdivision (b), however, the defendant need not make an express verbal offer of sex. (*People v. Superior Court (Hartway)* (1977) 19 Cal.3d 338, 347 [138 Cal.Rptr. 66, 562 P.2d 1315].) "Although most solicitations are verbal, we are not prepared to accept [the] suggestion that the concept be limited, for the purposes of this statute, to 'verbal offers.' If we so held, well-advised prostitutes would immediately enroll in sign language courses." (*Id.* at pp. 346–347.) Nor is a criminal solicitation limited to those specifying price and services. (*Id.* at p. 347; see *In re Elizabeth G.* (1975) 53 Cal.App.3d 725, 727, 729–730 [126 Cal.Rptr. 118].)

In *Elizabeth G.*, for example, the minor appellant argued that there was insufficient evidence of solicitation because she and the undercover officer never discussed prices, and no money exchanged hands. (*In re Elizabeth G., supra*, 53 Cal.App.3d at p. 729.) Rather, officers made an appointment over the phone to see the minor and another girl. (*Id.* at p. 727.) At the minor's instruction, the officers picked up the girls and drove them to a motel. When an officer asked how much it would cost, the minor said they would not talk

---

[6] The jury was instructed with CALCRIM No. 1154, which also states that a "person engages in an act of prostitution if he or she has sexual intercourse or does a lewd act with someone else in exchange for money or other compensation. A lewd act means touching the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification. Under the law, when a prostitute and a customer engage in sexual intercourse or lewd acts, both of them are engaged in an act of prostitution."

about it until they were in the room. Based on the "circumstances of [these] events," that no money changed hands was irrelevant to the solicitation charge, and the court therefore rejected the challenge to the conviction. (*Id.* at p. 730.)

Similarly, Mecano did not expressly state he wanted sex from Taylor. He did not, for example, use the word "sex" or other sexually explicit language. But neither the standard of review nor section 647, subdivision (b), required such blatant behavior. Mecano said many things implying he wanted to have sex with Taylor: he told her he could help her out; he could get her released on her own recognizance, but she would owe him; he asked where she lived and how to find her if he wanted to see her; he wanted to wine and dine her; and he suggested that her boyfriend was not good enough for her and she should be treated better. Mecano gave her $200 in cash and told her to take the cab to a Holiday Inn, where she should have a shower and wait for him to get off work. He warned her not to burn him for the money. When she did burn him, he tried to track her down by calling the cab company and cabdriver to find out where she had been dropped off.

Other evidence corroborated Taylor's story. Within weeks and months of Taylor's arrest, she told a story consistent with the above to two officers. She told Officer Holloway that an Asian sergeant released her and gave her $200 to go to a hotel and take a shower. The "sergeant" warned Taylor not to burn him. Taylor similarly told Sergeant Smith that Mecano said he could get her "O.R'd," but she would "owe" him. He gave her $200 in $20 bills, ordered a cab for her, and told her to go to the Holiday Inn where he would meet her after work. The cabdriver who picked Taylor up in front of the police station also verified that she was visibly upset and that she proclaimed her fear of the "policeman." He confirmed that Taylor had cash to pay for the taxi. The taxicab company's records showed that Mecano called the company repeatedly to ask where Taylor had been dropped off. Mecano also went to the great length of getting and calling the cabdriver's personal number.

█ From this evidence, the jury could reasonably conclude that Mecano specifically intended to solicit sex from Taylor. After repeatedly flattering her, he used his position to get her released on her own recognizance. He took the unusual steps of calling a cab for her and giving her $200, an amount greatly in excess of the cab fare. He told her to meet him at a Holiday Inn, where she should shower. Had Mecano expected nothing in exchange for the money, he would not have told her he would be "fucking pissed" if she "burn[ed]" him for it. The money thus made explicit any ambiguity behind Mecano's flattery: she was to meet him at the motel and have sex with him in exchange for the $200.

Although this certainly constituted sufficient evidence Mecano solicited Taylor for an act of prostitution, Mecano appears to argue that there had to be an "overt act" in furtherance of an agreement to engage in such an act. This argument misconstrues section 647, subdivision (b). The section originally proscribed soliciting an act of prostitution or engaging in an act of prostitution. (*In re Cheri T.* (1999) 70 Cal.App.4th 1400, 1405 [83 Cal.Rptr.2d 397].) It did not mention an agreement to engage in an act of prostitution. (*Ibid.*; *Kim v. Superior Court* (2006) 136 Cal.App.4th 937, 941 [39 Cal.Rptr.3d 338].) The language concerning such an agreement was added in 1986 "to close a loophole which permitted 'street wise' prostitutes from avoiding prosecution. . . . Experienced prostitutes were able to exploit this to their advantage by playing 'word games' with undercover vice officers, who were unable to make an arrest for solicitation if they raised the topics of either sex or money with a suspected prostitute." (*In re Cheri T,* at p. 1405, fn. omitted; see *Kim,* at p. 941 [§ 647, subd. (b), was expanded to permit conviction for an agreement to engage in an act of prostitution].)

■ Although section 647, subdivision (b), therefore can be violated where there was evidence of an agreement to engage in an act of prostitution, it can also be violated where, as here, there was evidence the defendant merely *solicited* an act of prostitution. Thus, the section provides that a person commits disorderly conduct "[w]ho solicits *or* who agrees to engage in or who engages in any act of prostitution." (§ 647, subd. (b), italics added.) Here, count 1 was based on Mecano soliciting Taylor for sex as opposed to an agreement to engage in an act of prostitution. The indictment, for example, stated, "Mecano . . . did unlawfully attempt to solicit another, Taylor P., to engage in an act of prostitution." The jury also was only instructed on solicitation under CALCRIM No. 1154. The jury was not instructed on an agreement to engage in an act of prostitution under, for example, CALCRIM No. 1155.

■ Assuming, however, that an agreement to engage in an act of prostitution was at issue, we would find that there was sufficient evidence of such an agreement. As we have detailed, Mecano told Taylor he could get her released, but she would owe him. He wanted to wine and dine her and treat her right. He told her to take a shower at the Holiday Inn, where he would meet her after work. She took the money he gave her but went to Pacific Coast Highway instead of the motel. If this "agreement" was ambiguous, then Mecano's overt acts underscored its meaning and his intent. (*In re Cheri T., supra,* 70 Cal.App.4th at p. 1407 ["[T]o ease concerns that ambiguous conduct or statements might lead to false arrests" for violations of the section, the Legislature added the overt act requirement, namely, no agreement to engage in an act of prostitution shall violate the section unless some clarifying or corroborating act in furtherance of it was committed.].)

In *Cheri T.*, for example, the defendant's act of grabbing an undercover officer's crotch "eliminated any ambiguities as to what she agreed to do." (*In re Cheri T., supra*, 70 Cal.App.4th at p. 1408.) The overt act, however, need not be either so obvious or a physical one. Words alone can constitute " 'acts in furtherance' " of an agreement to engage in prostitution. (*Kim v. Superior Court, supra*, 136 Cal.App.4th at pp. 944–945.) Still, not "all statements will suffice; to constitute an act that satisfies the statutory requirement, the statements must be unambiguous and unequivocal in conveying that the agreed act of prostitution will occur and move the parties toward completion of the act." (*Id.* at p. 945 [telling an undercover officer to undress was a clear and unequivocal statement in furtherance of the agreement to engage in an act of prostitution].)

To the extent Mecano argues that there was no evidence he committed an "overt act" that clarified or corroborated an agreement to engage in an act of prostitution, surely ordering a taxi for Taylor, giving her $200 in cash, and telling her to shower at a motel and wait until he got off work and met her there constituted such acts. The trial court, in denying Mecano's new trial motion, aptly summarized this evidence: "As to count 1, . . . it is argued that Taylor was so unreliable in her recounting of events that the evidence is wholly insufficient to support a conviction for solicitation of prostitution . . . . [¶] . . . That at best, her testimony was speculative that the defendant wanted [to have] sex with her. . . . [¶] The court acknowledges that Taylor was not clear on details and could not lay a proper foundation for past recollection recorded. I observed Taylor to have . . . a very sketchy and hazy recollection of the events, and indeed that was the case. But I will say this: I thought the basic thread of her testimony rang true. It just made no sense for Officer Mecano to give her $200 of his own money, to call a taxi company, to obtain the home telephone number of the taxi driver to find out where the driver had dropped Taylor off. It also made no sense for Taylor to make this up. It's indisputable that the defendant withdrew $200 from the station ATM, and it is indisputable that Taylor was released, but her boyfriend was held in custody. I found her story held together."

We agree and reject Mecano's challenge to his conviction of solicitation of prostitution.

II.–V.\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

\*See footnote, *ante*, page 1061.

## DISPOSITION

The judgment is affirmed.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied April 17, 2013, and appellant's petition for review by the Supreme Court was denied July 10, 2013, S210407.