Filed 9/23/13  P. v. Chhom CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SOPHON CHHOM,<br><br>    Defendant and Appellant. | B242707<br><br>(Los Angeles County<br>Super. Ct. No. GA083225) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell S. Mavis, Judge.  Affirmed.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

Defendant Sophon Chhom appeals from the judgment entered after a jury found him guilty of the attempted murder of Marcelio Rodriguez, Jr., (Pen. Code,[1] §§ 187, subd. (a), 664; count 1), assault by machine gun or assault weapon (§ 245, subd. (a)(3); count 2), and assault with a semiautomatic firearm (§ 245, subd. (b); count 3).[2]

On count 1, the jury found true the allegations that the attempted murder was willful, deliberate, and premeditated (§ 664, subd. (a)) and that during the commission of the offense Chhom personally used a firearm (§ 12022.53, subd. (b)) and personally and intentionally discharged a firearm (§ 12022.53, subd. (c)). The jury also found true the allegations that Chhom personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d))[3] and personally inflicted great bodily injury (§ 12022.7, subd. (a)), causing Rodriguez to become comatose (§ 12022.7, subd. (b)). As to counts 2 and 3 the jury found true the allegations that Chhom personally used an assault weapon (§ 12022.5, subd. (b)), personally and intentionally used a firearm (§ 12022.5), and personally inflicted great bodily injury (§ 12022.7, subd. (a)) that caused Rodriguez to become comatose (§ 12022.7, subd. (b)). The trial court sentenced Chhom to state prison for life with the possibility of parole, plus 25 years to life.

Chhom appeals, challenging the sufficiency of the evidence supporting the jury's determination that his attempted murder of Rodriguez was willful, premeditated, and

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] On the People's motion prior to opening statements, the trial court dismissed a fourth count charging Chhom with possession of an assault weapon (§ 12280, subd. (b)).

[3] The verdict form for count 1 erroneously stated that a "principal" personally and intentionally discharged a firearm. "Principal" can only have referred to Chhom because Chhom acted alone and was the only principal. The amended information correctly alleged that Chhom "personally and intentionally discharged a firearm" causing "great bodily injury and death to" Rodriguez within the meaning of section 12022.53, subdivision (d).

deliberate.  Chhom also argues that the trial court erred by ruling that Rodriguez's preliminary hearing testimony was admissible at trial because Rodriguez was unavailable.  We affirm the judgment.

## FACTUAL BACKGROUND

On May 9, 2011 Chhom lived in a mobile home park in Monterey Park. Rodriguez, also known as Junior, and Steven Lackey also lived in the park.  The three men knew each other.  Chhom's neighbors described him as "happy-go-lucky," "polite and nice," "quiet," and "friendly."  He kept to himself, spending most of his time alone and with his dogs.

On the morning of May 9 Lackey was lying in his bed watching television when he heard Rodriguez shout, "What are you going to do, kill me?"  Lackey got out of bed to see what was happening and heard a gunshot.  When he arrived at his window he saw Chhom standing outside his door, holding a black gun and looking down.  Lackey described the gun as "gruesome looking" and as "some sort of automatic weapon." Lackey heard two more gunshots, after which Chhom "walked away."[4]  Lackey could not see the person on the ground, but he assumed it was Rodriguez "because of the words and the sound of his voice."

Once he felt it was safe to go outside, Lackey opened his front door and saw Rodriguez on the ground.  Lackey yelled for his father to call 911 and get some towels and then tried to help Rodriguez, who was "in bad shape."  According to Lackey, Rodriguez had been shot in the face and there was blood everywhere.  Rodriguez "was

---

[4]     Two other residents of the mobile home park, Pedro Ocampo and Elizabeth Gudino, heard the gunshots.  Ocampo was awakened to the sound of three gun shots.  He walked outside and saw Rodriguez on the ground.  Gudino also heard three shots.  She immediately looked out her window and saw Chhom walking to his trailer while carrying a "black weapon."

3

gurgling, trying to breathe."[5]  After the police contained Chhom in the back of the mobile home park, the paramedics picked up Rodriguez who was "in a dire situation" and transported him to the hospital.

Monterey Park Police Captain Eugene Harris arrived at the mobile home park and moved Chhom into his patrol car in order to take him to the police station.  While seated in the front seat of Captain Harris' car, a woman asked Chhom through an open window, "You didn't do it, did you?"  Chhom responded, "I had to do it.  I had to do it."

Detective Joann Frescas from the Monterey Park Police Department obtained a warrant to search Chhom's trailer.  Executing the warrant, officers found a .32 caliber semiautomatic handgun and a loaded TEC-9 nine-millimeter handgun.[6]  Lackey and Gudino later identified this TEC-9 as the weapon Chhom was carrying.

Back at the Monterey Park Police Department, Detective Frescas conducted a videotaped interview of Chhom.  Chhom said that he had moved to the United States from Cambodia in 1979 and had lived alone in the trailer park since 1985.  During the interview, Chhom spoke about the family he left behind and his war experiences in Cambodia during the time of the Khmer Rouge and the Killing Fields.  He said "they tried to kill me, I tried to kill them."

Chhom stated that Rodriguez had knocked on his door that morning and asked to use his cell phone.  Chhom told Rodriguez that he was sorry but could not let him use his phone.  Chhom closed his door and Rodriguez walked away upset.  Rodriguez returned shortly thereafter, kicked Chhom's door, said "fuck you," walked to Lackey's trailer, and then sat down and smoked.

Chhom said Rodriguez's kicking on his door "made me feel stronger."  He further stated:  "My enemy, something go wrong, my thought go stronger, go fight. . . . [Y]ou make trouble with me means that you make war with me."  Chhom considered

---

[5]  According to Ocampo, Lackey was "freaking out" and said "Sophon shot Junior."

[6]  The TEC-9 is "a semiautomatic assault pistol."  (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 470.)

4

Rodriguez's act of kicking his door and saying "fuck you" as a threat. Chhom thought Rodriguez had a gun because he came over to kick on Chhom's door. Chhom said he had never argued with Rodriguez before "but this time, maybe he's too much drug, maybe too much dope in his head. I don't know. Maybe he's crazy, you know, and I cannot accept that."[7] Chhom added: "I think maybe the guy bring gun to shoot me and I'm going to go shoot him first, man. I know how to kill." Chhom stated that Rodriguez was "a lot like, gang something label tattoo, all other thing, man. I don't like it."

Chhom retrieved his semiautomatic TEC-9, which he kept under the pillow on his bed, and walked over to Rodriguez. When Rodriguez saw the gun, he said, "you want to shoot me?" Chhom told him "you cannot do that to me," and shot Rodriquez three times. After the first shot, Rodriguez fell to the ground. Chhom then shot him two more times because he did not "want him alive" and wanted to kill him. Chhom returned to his trailer where he put his gun on the table and removed the ammunition.

When Detective Frescas asked Chhom if he wanted to scare Rodriguez, Chhom said, "I cannot take my gun to scare someone and go to jail for nothing." When the detective asked Chhom whether he was "going there to shoot him and kill him," Chhom replied, "Yeah, of course. I'm going to kill, I'm going to kill, okay?"

Deputy Sheriff Edmund Anderson, a firearms identification expert, inspected and test-fired the TEC-9 recovered from Chhom's trailer. The deputy described the weapon as a semiautomatic pistol that qualified as an assault weapon under California law. Deputy Anderson confirmed that the TEC-9 was operable and that the casings recovered from the crime scene had been fired from it.

---

[7] Gudino said Rodriguez smoked marijuana. Ocampo confirmed that Rodriguez used drugs. Although Ocampo believed Rodriguez was a "good person," he tried to avoid Rodriguez because of how other people perceived him. Ocampo said that Rodriguez was "all tatted up, the devil horns and everything. People see him as a bad person." When asked about Rodriguez's tattoos, Ocampo replied, "Mostly the tattoos from his head, he has devil horns on his front. He has other tattoos on his back of his head, and he — he never lets his hair grow so the tattoo is very visible for the eye to see."

At trial, the court found that Rodriguez was unavailable and allowed the jury to hear his testimony from the preliminary hearing. Rodriguez testified at that hearing that after the shooting he was in a coma for four days. He described his injuries and the severe medical problems he experienced as a result of the shots to his face, neck, and chest. At the time of the shooting on May 9, 2011, Rodriguez weighed 185 pounds. At the time of the preliminary hearing on February 22, 2012, Rodriguez weighed only 89 pounds. He had difficulty walking, he was in constant pain as a result of nerve damage, he could only eat through a G-tube in his stomach, and his jaw had been wired since May or June 2011.

Rodriguez was unable to identify Chhom or anyone else as his shooter. Although he remembered having to use a phone on the day of the shooting, he did not remember seeing Chhom, asking to borrow Chhom's phone, or kicking Chhom's door. He only remembered seeing a gun and a silhouette.

## DISCUSSION

A. *Substantial Evidence Supports the Jury's Determination that the Attempted Murder Was Willful, Deliberate, and Premeditated*

Chhom does not challenge the sufficiency of the evidence supporting the jury's finding that he attempted to murder Rodriguez. He challenges only the jury's finding that the attempted murder was willful, deliberate, and premeditated. There is, however, ample evidence to support the jury's finding.

1. Applicable Law and Standard of Review

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.] Attempted murder requires express malice, that is, the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.'" (*People v.*

6

*Houston* (2012) 54 Cal.4th 1186, 1217; accord, *People v. McCloud* (2012) 211 Cal.App.4th 788, 796, 803.)

"We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation." (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199.) "An [attempted] killing is premeditated and deliberate if it occurred as the result of reflection rather than unconsidered or rash impulse. [Citations.] However, the requisite reflection need not span a specific or extended period of time. Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 213; accord, *People v. Watkins* (2012) 55 Cal.4th 999, 1026; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069; see *People v. Thompson* (2010) 49 Cal.4th 79, 114 ["''[p]remeditation and deliberation can occur in a brief interval'''"]; *People v. Gonzalez* (2012) 210 Cal.App.4th 875, 886 ["process of deliberation and premeditation does not require any extended period of time"].) "''Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.'" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

There are "'''three categories of evidence relevant to resolving the issue of premeditation and deliberation:''''" (1) prior planning activity, (2) motive, and (3) manner of killing. (*People v. Houston*, *supra*, 54 Cal.4th at p. 1216; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27; *People v. Mejia* (2012) 211 Cal.App.4th 586, 605.) These categories "'''are not exclusive, nor are they invariably determinative.''''" (*Houston*, *supra*, at p. 1216, quoting *People v. Lee* (2011) 51 Cal.4th 620, 636; see *People v. Gonzalez* (2012) 54 Cal.4th 643, 663.) They are "''''''simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.''''''" (*Houston*, *supra*, at p. 1216; accord, *People v. Streeter* (2012) 54 Cal.4th 205, 242.) The court may also consider other evidence that supports a finding of

7

premeditation and deliberation. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1253; *People v. Gonzalez, supra*, 210 Cal.App.4th at p. 887.) "It also is not necessary that any of these categories of evidence be accorded a particular weight [citation], and it is not essential that there be evidence of each category to sustain a conviction." (*Gonzalez, supra*, 210 Cal.App.4th at p. 887.)

"In determining the sufficiency of the evidence proving premeditation and deliberation, we review the entire record in the light most favorable to the People to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [premeditation and deliberation] beyond a reasonable doubt. [Citation.]" (*People v. Marks* (2003) 31 Cal.4th 197, 230; see *People v. Davis* (2013) 57 Cal.4th 353, 357.) We may only reverse for insufficient evidence if it appears that under no hypothesis whatever is there sufficient substantial evidence to support the jury's finding. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *People v. Mecano* (2013) 214 Cal.App.4th 1061, 1068.)

2.      Analysis

The record contains substantial evidence of premeditation and deliberation. Chhom viewed Rodriguez's conduct in kicking his door and saying "fuck you" as a threat. He believed that if "you make trouble with me means that you make war with me" and that no one should "mess with Cambodia." It was with this mindset that Chhom retrieved his TEC-9 semiautomatic pistol from under his pillow and set out to implement his plan to shoot and kill Rodriguez.

The manner of the attempted murder also demonstrates premeditation and deliberation. When Rodriguez saw that Chhom had a gun, Rodriguez did not put up any struggle. He merely asked Chhom if he was going to shoot him. Chhom then shot Rodriguez once at close range. While Rodriguez was on the ground, Chhom shot him two more times and then calmly walked back to his trailer. Each of the rounds that Chhom fired hit Rodriguez in the upper portion of his body, inflicting serious injuries to his face, neck, chest and shoulders. Chhom's method of shooting was sufficiently

8

"'particular and exacting'" to justify an inference that Chhom was acting in accordance with a preconceived design. (*People v. Caro* (1988) 46 Cal.3d 1035, 1050; see *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1071 ["manner of killing reflected stealth and precision"]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [defendant shot victims in the head or neck from within a few feet]; *People v. Marks*, *supra*, 31 Cal.4th at p. 230 [shooting manifested all three factors relevant to the premeditation and deliberation equation].) Therefore, the record contains substantial evidence from which a reasonable jury could conclude beyond a reasonable doubt that Chhom's attempted murder of Rodriguez was willful, premeditated, and deliberate. (*People v. Watkins*, *supra*, 55 Cal.4th at p. 1026.)

B. *The Trial Court Did Not Err by Admitting Rodriguez's Preliminary Hearing Testimony Because of His Unavailability*

Chhom argues that Rodriguez was not unavailable as a witness for Sixth Amendment purposes and that the admission of his preliminary hearing testimony violated Chhom's constitutional right to confrontation. We conclude that the trial court properly ruled that Rodriguez was unavailable and that his prior testimony was admissible.

1. Applicable Law and Standard of Review

A criminal defendant is constitutionally guaranteed the right to confront adverse witnesses. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15; *People v. Fuiava* (2012) 53 Cal.4th 622, 674; *People v. Carter* (2005) 36 Cal.4th 1114, 1172; *People v. McCoy* (2013) 215 Cal.App.4th 1510, 1527.) This right "is not absolute, however, and may 'in appropriate cases' bow to other legitimate interests in the criminal trial process." (*Carter*, *supra*, at p. 1172; accord, *People v Hollinquest* (2010) 190 Cal.App.4th 1534, 1546.) "An exception to the confrontation requirement exists where the witness is unavailable, has given testimony at a previous judicial proceeding against the same defendant, and was subject to cross-examination by that defendant." (*Carter*,

9

*supra*, at p. 1172; accord, *Fuiava*, *supra*, at p. 674; *People v. Thomas* (2011) 51 Cal.4th 449, 499.) Under this exception, "'the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right.'" (*People v. Roldan* (2012) 205 Cal.App.4th 969, 979, quoting *People v. Herrera* (2010) 49 Cal.4th 613, 621.) "[T]he prosecution has the burden of proof when it comes to establishing the unavailability of its witnesses." (*Roldan*, *supra*, at p. 984.)

Under federal law, an absent witness is unavailable in the constitutional sense if the prosecution has made a good faith effort to secure the witness' presence at the trial. (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 675; *People v. Herrera*, *supra*, 49 Cal.4th at p. 622; *People v. Roldan*, *supra*, 205 Cal.App.4th at p. 979.) California law allows use of a witness' prior testimony "only when the unavailability of the witness and the reliability of the testimony are established." (*People v. Carter*, *supra*, 36 Cal.4th at p. 1172; see Evid. Code, § 1291, subd. (a)(2).) A witness is unavailable if the witness is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "Reasonable diligence, often called 'due diligence' in case law, "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character."'" (*People v. Cogswell* (2010) 48 Cal.4th 467, 477, see *Herrera*, *supra*, at p. 622.) "'Relevant considerations include "'whether the search was timely begun'" [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation].' [Citation.]" (*Fuiava*, *supra*, at p. 675; accord, *Herrera*, *supra*, at p. 622.) "In this regard, 'California law and federal constitutional requirements are the same . . . .'" (*Herrera*, *supra*, at p. 622, accord, *Roldan*, *supra*, at p. 979.)[8]

---

[8] "The testimony is deemed reliable if '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.'" (*People v. Carter*, *supra*, 36 Cal.4th at p. 1172, quoting Evid. Code, § 1291, subd. (a)(2).) Chhom does not argue that

"We review de novo the issue of whether the prosecution, in using the preliminary hearing testimony of [the witness], satisfied the due diligence requirement in attempting to produce him at trial, so as to justify an exception to defendant's constitutionally guaranteed right of confrontation at trial." (*People v. Martinez* (2007) 154 Cal.App.4th 314, 323-324, citing *People v. Smith* (2003) 30 Cal.4th 581, 610 and *People v. Cromer* (2001) 24 Cal.4th 889, 901.) In so doing, "we 'defer to the trial court's determination of the historical facts of what the prosecution did to locate an absent witness,' [after which] we 'independently review whether those efforts amount to reasonable diligence sufficient to sustain a finding of unavailability.'" (*People v. Thomas*, *supra*, 51 Cal.4th at p. 503, quoting *People v. Bunyard* (2009) 45 Cal.4th 836, 851; accord, *Smith*, *supra*, at p. 610; *People v. Avila* (2005) 131 Cal.App.4th 163, 169.)

2.      Analysis

The People's efforts to secure Rodriguez's testimony at Chhom's trial commenced on June 6, 2012, three weeks before trial began. The People were unsuccessful because Rodriguez had moved. On June 12, however, an investigator located Rodriguez and served him with a subpoena, although it was the wrong type of subpoena. On June 14 the investigator served Rodriguez with a proper out-of-county subpoena and told him to contact the district attorney's office, which would make his travel arrangements. The subpoena directed Rodriguez to appear in court on June 18, 2012. When Rodriguez failed to contact the district attorney's office, Deputy District Attorney Jose Gonzalez asked the trial court to issue and hold a bench warrant.

On June 20, 2012 Gonzalez spoke with Rodriguez who was cooperative and agreed to testify at trial. Gonzalez advised Rodriguez that a witness coordinator would contact him and make the necessary travel arrangements. The witness coordinator attempted to contact Rodriguez the next day but was unable to reach him until June 25, at

the People failed to establish that Rodriguez's preliminary hearing testimony was reliable.

which time Rodriguez was upset. At the request of the coordinator, Gonzalez called Rodriguez and spoke with him for an hour or an hour and a half. Rodriguez was "very upset" and said he did not want to come to Los Angeles. Gonzalez, who knew that the court had already issued and held a bench warrant on June 18, warned Rodriguez that the court would issue a warrant for his arrest if he did not comply. Gonzalez told Rodriguez that he would prefer to fly Rodriguez down to Los Angeles and put him up in a hotel than to have him arrested. At the end of the conversation Rodriguez agreed to appear. Gonzalez assured Rodriguez that he would also pay for a caretaker to accompany him. Rodriguez stated that he did not have a caretaker but would ask his sister to accompany him. Rodriguez said he would call back, but never did. Attempts to contact Rodriguez on June 26 were unsuccessful.

On June 27, 2012 trial commenced. Gonzalez informed the trial court that Rodriguez had become uncooperative and asked the court to lift the hold on the bench warrant "so that we can proceed with trying to bring him to Los Angeles County." Gonzalez asked "that bail be set at, certainly, a high enough amount where he would not be cited out. Because if that would happen, I don't know if we're going to be getting him. So I want him to be able to be brought forth." The court issued "[t]he bench warrant that was previously held" and set bail at $50,000. Gonzalez advised the court that Rodriguez was "very physically disabled" and questioned whether the investigators "have the tools to transport someone who is disabled." Gonzalez also noted that Rodriguez might need medical clearance before law enforcement officials could transport him.

On July 2, 2012, after the People's last witness had testified, Gonzalez advised the trial court that he had not had any further contact with Rodriguez and that given his fragile medical state, law enforcement was unwilling to transport him and assume liability for doing so. Gonzalez asked the trial court to declare Rodriguez unavailable and to admit his preliminary hearing testimony into evidence. Counsel for Chhom objected, asserting Chhom's constitutional right to confront his adverse witnesses.

12

The trial court held a due diligence hearing at which Detective Frescas testified that she had called Rodriguez's sister Christine in Fresno on June 27 and asked whether she and her brother were going to appear in court. Christine told Detective Frescas that her brother was adamant about not coming to court because he was physically unable and did not want to appear. Detective Frescas asked Christine if she were 100 percent sure. Christine said yes and that Rodriguez would not be available. The detective conveyed this information to the district attorney's office.

Mark Felix, an investigator from the district attorney's office in Pasadena, testified that he located Rodriguez in Fresno with the assistance of Shelley Sweeten, an investigator from Fresno. Sweeten, who met with Rodriguez, informed Felix that Rodriguez appeared "very ill," was very thin, and appeared to weigh less than 100 pounds. Rodriguez told Sweeten that he was on a feeding tube and had difficulty walking. According to Felix, it initially appeared as if Rodriguez would cooperate, but he changed his mind. When Felix spoke to Rodriguez and his sister, they made it clear that Rodriguez was not physically well enough to travel from Fresno to Los Angeles.

Gonzalez told Felix that on June 27, 2012 the court had issued a bench warrant and set bail at $50,000. In an effort to secure Rodriguez's appearance at trial, Felix contacted his supervisor to find out whether he could take Rodriquez into custody and, given Rodriguez's medical condition, whether it would be feasible to transport him. Felix also contacted the sheriff's department, which apprised him that, in order to bring Rodriguez to Los Angeles, Rodriguez "would have to be in custody," there would have to be "medical clearance from Fresno," and "there would have to be an order of the court specifically directing them to transport" Rodriguez from Fresno to Los Angeles. Felix learned, however, that the district attorney's office was not medically equipped to provide for custodial transportation from Fresno to Los Angeles.

In light of Felix's testimony, Gonzalez asked the court to issue an order authorizing law enforcement to take Rodriguez into custody to evaluate whether he was medically fit for transportation to Los Angeles. Gonzalez argued this was necessary in order to ascertain Rodriguez's true physical condition because Rodriguez was not

13

responding or answering his phone. Gonzalez stressed "he's not necessarily being cooperative" and it therefore "goes beyond just the medical issue. It's just he doesn't want to be here, and he wants to completely disregard this court's order."

The trial court was unsure whether Rodriguez was uncooperative or physically unable to appear. The court was not willing "to sign an order compelling them to do something that would be against medical recommendation." The prosecutor argued, "we can't get that medical recommendation if he's not arrested and taken to a facility" and "that if he's not responding, then he's just not willing to participate, and he's blatantly disregarding the court order." The prosecutor again asked the court to issue an order to take Rodriguez into custody and to a medical facility to determine whether he was fit to travel. The trial court declined to make such an order, stating, "I don't want to sign an order that would jeopardize somebody's welfare."

The prosecution then called Joyce Berry, the witness assistant in the district attorney's Pasadena office who worked with Gonzalez, to testify further on the issue of due diligence. Berry recounted that she first made contact with Rodriguez on June 25, identified herself, and told Rodriguez that he was needed in court. Rodriguez said he needed a caregiver to accompany him. Berry asked Rodriguez if he had any family members who could come to court with him, and Rodriguez said he would ask one of his sisters and then get back to Berry. Rodriguez told Berry that he had health and money issues.

After learning that Rodriguez's sister Christine would accompany Rodriguez, Berry made the travel arrangements. Specifically, she arranged for Rodriguez and Christine to fly from Fresno to Los Angeles on June 28 and to stay at the Sheraton Hotel in Pasadena. When Berry called Rodriguez on June 26 to let him know about the travel arrangements, Rodriguez said he was resting and asked Berry to call him later. Berry was never able to reach him later on June 26 or June 27, despite her numerous attempts. Berry was able to reach Christine, who stated that she was aware of the situation and would be traveling with Rodriguez. Christine explained that she could not speak with

14

Berry at that time because Rodriguez was receiving medical treatment. Christine wrote down Berry's contact information and said she would call her later.

Christine did not call back. At 12:15 p.m. Berry again called Christine, who said that she had not spoken with her brother. Berry told Christine that the court was prepared to issue a warrant for her brother's arrest, but the district attorney did not want that to become necessary. Berry asked Christine to talk to her brother and let him know he was needed in court. Christine said she would call Berry back by 1:30 p.m., which she did not do. At 3:30 p.m. Berry again called Christine, who said her brother was not feeling well and was not going to appear in court. Christine said that Rodriguez did not care if he was arrested.

Rodriguez's father, Marcelino Rodriguez, Sr., also testified. He had seen his son 15 days earlier in Fresno for Father's Day. Rodriguez Sr. said his son weighed 75 pounds, was in a wheelchair, had a feeding tube in his stomach, and was unable to walk unassisted. Rodriguez Sr. did not think his son could travel on a plane, but might be able to travel to Los Angeles by car.

At the conclusion of the hearing the trial court found that Rodriguez's medical condition did not prevent him from coming to court, but that Rodriguez was nevertheless unavailable. In analyzing whether the People had demonstrated that they had exercised reasonable diligence within the meaning of Evidence Code section 240, subdivision (a)(5), the court relied on *People v. Cogswell*, *supra*, 48 Cal.4th 467, in which the Supreme Court held that the prosecution did not have to arrest the victim of a crime and bring him into court in order to establish due diligence.[9] The trial court ruled

---

[9] The victim in *Cogswell* lived in Colorado and testified at the defendant's preliminary hearing but refused to appear for trial despite having been subpoenaed in accordance with the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (§ 1334 et seq.). The Supreme Court held that the People's failure to utilize a provision in the Uniform Act did not preclude a finding of due diligence. (*People v. Cogswell*, *supra*, 48 Cal.4th at p. 471.) The Supreme Court explained: "To have a material witness who has committed no crime taken into

15

that Rodriguez was unavailable under *Cogswell* and therefore admitted Rodriguez's preliminary hearing testimony.

Having independently reviewed the evidence of the People's efforts to bring Rodriguez to the trial, we conclude that the People satisfied their burden of proving that they exercised due diligence in attempting to secure Rodriguez's presence and testimony at trial. Five different individuals (Gonzalez, Frescas, Felix, Berry, and Sweeten) made contact with Rodriguez or Christine in an effort to make sure Rodriguez came to court. Rodriguez hampered these efforts by often not answering his phone and not returning phone calls, vacillating between cooperation and lack of cooperation, and ultimately refusing to come to court.

The People timely served Rodriguez with a subpoena directing him to appear on June 18, and immediately asked the court to issue and hold a bench warrant when Rodriguez failed to make contact by that date. On the first day of trial, when it became clear that Rodriguez would not come to court voluntarily, Gonzalez asked the trial court to release the hold on the warrant and to set bail in a substantial amount. The People sought an order to have Rodriguez arrested so that he could be evaluated to determine whether he could travel to Los Angeles, but the trial court was unwilling make such an order without more information about Rodriguez's health. The trial court ultimately determined that such an order was unnecessary under *People v. Cogswell*, *supra*, 48 Cal.4th 467, and declared Rodriguez unavailable.

We agree with the trial court that under *Cogswell* the People did not need to arrest Rodriguez in order for the trial court to find that the People had acted with reasonable diligence. Given Rodriguez's fragile medical condition, to have arrested Rodriguez would have been a drastic measure with potentially adverse health consequences for Rodriguez. (See *People v. Cogswell*, *supra*, 48 Cal.4th at pp. 477-

---

custody, for the sole purpose of ensuring the witness's appearance at a trial, is a measure so drastic that it should be used sparingly. [Citation.]" (*Id.* at pp. 477-478.)

16

478.)  The People did virtually all they could, and their efforts were more than reasonable under the circumstances.

In light of the People's good faith efforts and reasonable diligence in attempting to secure Rodriguez's presence at trial, we conclude that the People satisfied the requirements of Evidence Code section 1291 and that Rodriguez was unavailable. Therefore, the admission of his preliminary hearing testimony did not violate Chhom's constitutional right of confrontation.

## DISPOSITION

The judgment is affirmed.


SEGAL, J.[*]


We concur:


PERLUSS, P. J.


WOODS, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.