[No. D059083. Fourth Dist., Div. One. Oct. 29, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER GONZALEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Discussion parts II and III.

## Counsel

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinión

**BENKE, Acting P. J.**—The trial court sitting as trier of fact found Christopher Gonzalez (Christopher) guilty of the following: count 1, attempted murder (Pen. Code,[2] §§ 664, 187, subd. (a)); count 2, assault with a deadly weapon (§ 245, subd. (a)(1)); count 3, first degree burglary (§§ 459, 460); count 4, aggravated mayhem (§ 205); and count 5, simple mayhem (§ 203). Additionally, the court found Christopher had personally used a dangerous weapon within the meaning of section 12022, subdivision (b)(1) and had personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). The court sentenced Christopher to a determinate sentence of nine years followed by an indeterminate term of 14 years to life.

Christopher appeals, contending: (1) the court prejudicially erred when it admitted evidence obtained in violation of his constitutional rights; (2) his conviction for simple mayhem must be vacated because it is a necessarily included offense of aggravated mayhem; and (3) "box 5" of the abstract of judgment should be corrected to reflect the imposition of a life sentence on count 1 only. As we explain, we reject his first contention but agree with his second and third contentions. We thus affirm in part and reverse in part his judgment of conviction.

---

[2] Statutory references are to the Penal Code unless otherwise specified.

## FACTUAL BACKGROUND[3]

In mid-August 2009, Maria Gonzalez (Maria) and her teenage daughter Selina G. were awakened at approximately 4:00 a.m. by knocking at their front door. It was Christopher, the son of Maria's former boyfriend Raymond Gonzalez (Ray). Christopher was upset after fighting with his father. Maria invited Christopher inside. About half an hour later, Maria's son Robert Gonzalez (Robert) came home with victim Daniel Castillo (Daniel).[4]

Maria decided to walk Christopher back to his father's house, which was only a few blocks away. Once back at his father's house, Christopher and Ray had another fight. Christopher then left with Maria to return to Maria's house. On the way back to Maria's house, they saw some tools on the ground, including a hammer and a crowbar. Maria recalled commenting to Christopher about the tools as they walked.

After Maria and Christopher returned to Maria's house, Robert, Selina and Daniel left to get something to eat. Christopher stayed behind with Maria. Sometime after 6:00 a.m., Christopher and Daniel went to a convenience store to buy alcohol. Robert, Daniel, Selina and Christopher then watched a movie. At 6:30 a.m., Maria left for work. When she left, everyone appeared to be enjoying the movie.

Five minutes after Maria left, Selina went to her bedroom to sleep, leaving the three men alone in the living room. Christopher asked Daniel for a cigarette, then went outside.[5] Robert went to his room and fell asleep, leaving Daniel alone in the living room.

A few minutes later, Selina returned to the living room after she heard noises outside. Recognizing that Christopher was gone, Selina unlocked the front door for Christopher and then returned to her bedroom. Inside her room, Selina heard someone outside opening the latch of the front gate. She went back to the living room and found Daniel looking out the window. Daniel told her that Christopher had just returned. As she returned to her room, Selina heard the sound of the front door opening.

About five minutes later, from inside her room Selina heard sounds in the living room that she described as similar to the noise her dogs make when

---

[3] We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Certain portions of the factual and procedural history related to Christopher's contentions are discussed *post*, in connection with those issues.

[4] Maria, Selina and Robert are not related to Christopher.

[5] Robert was uncertain whether Christopher left at 6:38 or 7:38 a.m., but he was certain that it was 38 minutes past the hour.

they jump off the couch. When the noise continued, Selina went to the living room and found Christopher standing behind the couch with his arm behind his back. Christopher told Selina that Daniel was sleeping. Frightened, Selina returned to her room and locked the door. Selina first called her mother and then she called 9-1-1.

As Selina was speaking to the 9-1-1 operator, Christopher knocked on the door and asked to use the telephone. Selina told the 9-1-1 operator that Christopher was banging on the door, then he began shaking the doorknob. When the banging stopped, Selina opened her door slightly and saw Daniel in the living room. His face was covered in blood. When asked, Selina explained to the 9-1-1 operator that she thought Daniel had been hit by a weapon because "his head [was] all smashed," his eye was "completely cut" and his temple looked as if it was "falling off."

A witness saw Christopher dispose of a hammer while Christopher was running in a drainage ditch. Sheriff's deputies recovered the hammer, which Maria later identified as the same hammer she and Christopher saw when out walking early in the morning. When the deputies arrested Christopher, he was sweating, breathing heavily and wearing only boxer shorts. Deputies transported Christopher to the sheriff's substation and placed a parole hold on him.

Daniel suffered a fractured jaw, cheekbone, skull and nose. He underwent multiple surgeries on his face. At trial, his upper lip remained a little numb, his right eyelid did not "feel right" and he had facial scars and a tracheotomy scar on his neck.

## DISCUSSION

### I

### Miranda *Violation*

Christopher contends the trial court erred when it refused to exclude his postarrest confession, which he contends was in violation of his rights under *Miranda*[6] and under the Fifth and Fourteenth Amendments. On review, we defer to the trial court's factual findings if they are supported by substantial evidence, but we decide de novo whether law enforcement lawfully obtained the incriminating statements. (*People v. Williams* (2010) 49 Cal.4th 405, 425 [111 Cal.Rptr.3d 589, 233 P.3d 1000].)

---

[6] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

### A. *Additional Background*

Once at the sheriff's substation, Detectives Licudine and Navarro interviewed Christopher. Christopher initially asked if he could speak with his parole agent Michael Lum. The detectives stated they needed to speak with Christopher first. They asked him some general intake questions. Detective Licudine then read Christopher his *Miranda* rights. Christopher stated he understood his rights and told the detectives he and Daniel had some problems because Daniel was "talking some stuff" to him.

As the detectives continued to question Christopher about the incident, Christopher unambiguously invoked his right to speak with an attorney. Detective Navarro replied, "No worries. No worries." Detective Navarro then asked Christopher if he wanted to speak with his parole agent. Detective Licudine offered to leave the room if Christopher wanted to speak with the parole agent. The detective told Christopher that she (the detective) would not be able to speak with him if he invoked his constitutional rights. Christopher responded, "Yeah, I, can talk to him [(i.e., the parole agent)]."

Agent Lum was at the station because the detectives asked him to arrange a parole hold on Christopher. He spoke to Christopher for about 10 minutes. During this time the detectives were not in the room.

The record shows Agent Lum encouraged Christopher to cooperate with detectives and to tell the truth, and told Christopher, "[t]alking about your side of the story helps me out, [and] helps yourself out." The record further shows that when Christopher expressed concern about going back to prison and getting the maximum punishment, Agent Lum stated, "[s]o help yourself out for yourself. Help yourself out. *I don't want to write the report that says subject was uncooperative with the . . . investigating detectives. Parole agent recommends maximum in-custody time. I don't want to write that.*" (Italics added.) Immediately after meeting with Agent Lum, Christopher changed his mind and agreed to speak with the detectives without counsel present.

The record shows the detectives then returned to the interview room, reread Christopher his *Miranda* rights and he then spoke to the detectives. Christopher told the detectives that Daniel provoked the attack because he called Christopher a "half[-breed]."[7] Christopher then went outside to "cool off," at which point he saw the hammer and decided to take it. When he returned to Maria's house, Christopher said he walked up behind Daniel, who was lying on the couch, and hit him twice in the face with the hammer.

---

[7] Daniel's statement to Christopher ostensibly was based on the fact one of Christopher's parents was Mexican and the other was Caucasian.

Christopher said that after the attack, he ran from the house and threw away the hammer and most of his clothes.

Christopher moved to suppress his post-invocation statements.[8] The trial court denied that request, ruling (during the trial, before the recording of the interview was played) that Christopher voluntarily waived his right to counsel and to remain silent.

### B. *The Court Erroneously Admitted Christopher's Confession into Evidence*

■ Before a lawful custodial interrogation can begin, the suspect must first be warned that he or she has the right to remain silent, that anything he or she says may be used as evidence against him or her and that during any questioning he or she has the right to the presence of an attorney, either retained or appointed. (*Miranda, supra*, 384 U.S. at pp. 444–445.) If, in response to a *Miranda* warning, the suspect clearly asserts his or her right to have counsel present, questioning must stop immediately. (*People v. Storm* (2002) 28 Cal.4th 1007, 1023 [124 Cal.Rptr.2d 110, 52 P.3d 52].) However, after a suspect has invoked his or her right to remain silent, the suspect may later initiate contact with an interrogator and voluntarily waive his or her right to counsel. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484–485 [68 L.Ed.2d 378, 101 S.Ct. 1880].)

■ "In general, a confession is considered voluntary 'if the accused's decision to speak is entirely "self-motivated" [citation], i.e., if he [or she] freely and voluntarily chooses to speak without "any form of compulsion or promise of reward. . . ." [Citation.]' [Citation.]" (*People v. Boyde* (1988) 46 Cal.3d 212, 238 [250 Cal.Rptr. 83, 758 P.2d 25]; see *People v. Thompson* (1980) 27 Cal.3d 303, 327–328 [165 Cal.Rptr. 289, 611 P.2d 883].) "However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law." (*People v. Boyde, supra*, 46 Cal.3d at p. 238.) Police officers' mere

---

[8] On this court's own motion, the record on appeal was augmented to include two related motions filed by Christopher before trial, which sought in part to exclude the post-invocation statements he made to police after he invoked his *Miranda* rights and then changed his mind and spoke to the detectives without counsel present. We also invited the parties to submit supplemental briefing on whether the trial court ruled on one or both motions and if so, on whether the issue was preserved on appeal, inasmuch as the augmented record shows the word "vacated" was written on the first page of each motion. We have read the parties' supplemental briefs, considered the augmented record and conclude, as do the parties, that Christopher has preserved on appeal the issue of the constitutionality of his post-invocation statements to police. Gonzalez subsequently augmented the record to include the hearing transcript from March 18, 2010, which we have considered in this appeal.

advice or encouragement that "it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not, however, make a subsequent confession involuntary." (*Ibid.*; see *People v. Jimenez* (1978) 21 Cal.3d 595, 611–612 [147 Cal.Rptr. 172, 580 P.2d 672], overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

"The distinction that is to be drawn between permissible police conduct on the one hand and conduct deemed to have induced an involuntary statement on the other 'does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth as represented by the police.' [Citation.] Thus, '[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, 'if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . .' [Citations.]" (*People v. Jimenez, supra,* 21 Cal.3d at pp. 611–612.)

Here, we have no quarrel with Agent Lum's statement to Christopher that to help himself Christopher needed to tell the truth and cooperate with police. That statement by Agent Lum—a person in authority (see *People v. Boyde, supra,* 46 Cal.3d at p. 238)—did not render Christopher's subsequent confession to detectives involuntary. (See *People v. Jimenez, supra,* 21 Cal.3d at p. 611 ["mere advice or exhortation by [a person in authority] that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary"].)

However, the record shows Agent Lum also told Christopher during their meeting that unless Christopher cooperated with police, he would be forced to write a parole report recommending Christopher for the "maximum in-custody time," which Agent Lum told Christopher he did not want to write. Implied within Agent Lum's statements to Christopher, who was fearful of returning to prison, was that if Christopher agreed to talk with detectives without counsel present his parole agent would recommend a shorter sentence in the parole report.

The record also shows that immediately after his meeting with Agent Lum, Christopher changed his mind and agreed to speak with the detectives without counsel present, despite his unambiguous request to speak to counsel just a few minutes earlier, after detectives began questioning Christopher about the incident involving Daniel.

■ Given the timing and sequence of events and the fact that the statements by Agent Lum promised Christopher a benefit and/or leniency *if* Christopher agreed to speak with the detectives without counsel present, we conclude Agent Lum's statements were a motivating cause of Christopher's decision to speak with police without counsel present. (See *People v. Boyde, supra*, 46 Cal.3d at p. 238.) We therefore conclude the trial court erred when it ruled Christopher voluntarily waived his previously invoked *Miranda* rights. (See *ibid.*) However, our conclusion does not fully resolve the issue.

### C. *The* Miranda *Error Was Harmless Beyond a Reasonable Doubt*

#### 1. *Governing Law*

Because we conclude that the trial court erroneously admitted Christopher's post-invocation statements, we next must determine whether that error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).) An error is harmless when it is found to be "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 111 S.Ct. 1884], disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475].)

Under the *Chapman* standard, the government has the burden to show that the guilty verdict "was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 113 S.Ct. 2078].) The proper test for prejudice requires consideration of not only the evidence that would support the judgment, but also the impact of the inadmissible evidence on the final outcome. (*People v. Mil* (2012) 53 Cal.4th 400, 417–418 [135 Cal.Rptr.3d 339, 266 P.3d 1030] [rejecting the substantial evidence test in evaluating prejudice].)

■ Confessions, as a class, will almost always provide persuasive evidence of a defendant's guilt and as such, "confessions often operate 'as a kind of evidentiary bombshell which shatters the defense.' " (*People v. Cahill, supra*, 5 Cal.4th at p. 503.) Therefore, the erroneous admission of a confession "is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard." (*Ibid.*) However, the improper admission of a confession can be harmless if, for example, the defendant confessed multiple times, was arrested in the course of committing the crime, if there are "numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence" or if the prosecution introduced a videotape of the commission of the crime. (*Id.* at p. 505.)

## 2. *Analysis*

Here, we conclude the admission of Christopher's post-invocation statements was harmless under *Chapman* for the following reasons:

First, during sentencing, the court, in response to a statement by Christopher's mother regarding her concern over the violation of her son's *Miranda* rights, noted: "[I]f it's any conciliation to Mrs. Gonzalez [(Christopher's mother)], my findings of beyond a reasonable doubt were based upon the defendant's actions and not so much his statements at all to the parole officer or any of those statements, but rather his actions." Thus, as trier of fact the record shows the trial court placed very little, if any, weight on Christopher's unlawful confession as the basis for its findings in support of his convictions for attempted murder (count 1), first degree burglary (count 3) and aggravated mayhem (discussed in the unpublished portion of the opinion, *post*, count 4).

Second, we conclude the admission of Christopher's confession was harmless because even excluding the unlawful confession we conclude there is sufficient admissible evidence in the record from a variety of "disinterested reliable" witnesses to support his conviction. (See *People v. Cahill, supra*, 5 Cal.4th at p. 505.) Selina testified that just moments before the attack, she saw Christopher standing behind the same couch where Daniel was lying. Selina saw Christopher's arm behind his back, supporting the inference Christopher was hiding something in his hand. Selina further testified she retreated to her room because she was afraid of Christopher, after he claimed Daniel was "sleeping" on the couch. While on the phone with the 9-1-1 operator, Selina testified she heard additional noises coming from the living room. While still on the phone with the 9-1-1 operator, Selina opened her door slightly and saw Daniel bleeding profusely. Selina contemporaneously reported to the 9-1-1 operator that it appeared Daniel had been attacked with a weapon, given the severity of his injuries.

Moreover, a witness told detectives he saw Christopher dispose of a hammer while Christopher was running in a drainage ditch. Detectives retrieved the hammer and Maria identified the hammer as the same one she had seen earlier that morning while walking with Christopher.

Third, we note from the record that immediately *before* Christopher invoked his *Miranda* rights he told the detectives that he and Daniel were having some problems because Daniel was "talking . . . stuff" to him. This statement was admissible and could be properly considered by the trier of fact in determining guilt.

Because there is ample admissible evidence in the record supporting the guilty findings of the trial court, we conclude the trial court's error in admitting the unlawful confession was harmless under *Chapman*.

### 3. *Christopher's Contentions Do Not Change Our Conclusion That the Admission of His Involuntary Confession Was Harmless Beyond a Reasonable Doubt*

Christopher, however, contends the post-invocation statements were significant because he told the detectives his motive for the attack. At most, Christopher's post-invocation statement that Daniel called him a "half-breed" merely explained the "stuff" Daniel had said to Christopher that morning which precipitated the attack.

Christopher further contends that his post-invocation statements added "important details" because he told detectives he got the hammer from outside and hit Daniel with it twice while Daniel was lying on the couch. However, there is ample evidence in the record—and inferences that can be drawn from such evidence—other than the unlawful confession establishing these alleged "important details," including the testimony of both Robert and Daniel that Christopher was outside immediately before the attack, the testimony of Maria that while out walking on the morning of the attack she and Christopher saw "tools," including a hammer, near Maria's house, the testimony of Selina that immediately before the attack Daniel was alone in the living room, lying on the couch, that after she heard some noises she came out of her room and found Christopher standing behind the couch with his arm behind his back, and that Christopher told Selina that Daniel was "sleeping," and the testimony of a witness who saw Christopher throw a hammer into a drainage ditch, which police subsequently recovered. Thus, we conclude the "important details" Christopher told the detectives during his post-invocation confession were otherwise proved beyond a reasonable doubt by properly admissible evidence.

Christopher also contends that absent his unlawful confession, there is insufficient evidence to show premeditation and deliberation for attempted murder in count 1. We disagree.

■ A crime is premeditated when it is considered beforehand and deliberate when the decision to commit the crime is formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485]; see *People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335] [noting that " '[d]eliberation' refers to careful weighing of considerations in forming a course of action" and that " 'premeditation' means thought over in advance"].)

The process of deliberation and premeditation does not require any extended period of time: " 'The true test is not the duration of time as much as

it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*People v. Mayfield, supra*, 14 Cal.4th at p. 767, quoting *People v. Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]; accord, *People v. Perez* (1992) 2 Cal.4th 1117, 1127 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) The requirement of premeditation and deliberation excludes acts that are the "result of mere unconsidered or rash impulse hastily executed." (*People v. Thomas, supra*, 25 Cal.2d at pp. 900–901.)

■ In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], our high court identified three categories of evidence ordinarily used to establish premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing or wounding. These categories are a guide and do not exclude other types of evidence, or combinations of evidence, that support a finding of premeditation and deliberation. (*People v. Prince* (2007) 40 Cal.4th 1179, 1253 [57 Cal.Rptr.3d 543, 156 P.3d 1015].) It also is not necessary that any of these categories of evidence be accorded a particular weight (*People v. Sanchez* (1995) 12 Cal.4th 1, 32–33 [47 Cal.Rptr.2d 843, 906 P.2d 1129], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]), and it is not essential that there be evidence of each category to sustain a conviction (*People v. Romero* (2008) 44 Cal.4th 386, 401 [79 Cal.Rptr.3d 334, 187 P.3d 56]).

Here, Maria testified the "tools" she and Christopher saw before the attack were about four blocks from her house. Maria also identified the hammer a witness saw Christopher throw away as the same hammer she and Christopher saw before the attack, when they were out walking together. Given this evidence and the evidence that Christopher was outside shortly before the attack and was angry with Daniel for saying some "stuff" to him, we conclude there is ample admissible evidence in the record of planning activity, motive and the means to carry out the attempted murder to support the finding of premeditation and deliberation by Christopher. (See *People v. Anderson, supra*, 70 Cal.2d at pp. 26–27.)

Finally, Christopher contends that the prosecutor relied upon his post-invocation statements during closing argument. However, many of the statements made by the prosecutor were based on inferences that could have been made from the testimony of the witnesses and the physical evidence. Although, the prosecutor did state that the burglary count was "simple" based on Christopher's confession, we conclude this statement was harmless because the requisite element of entering a dwelling with the intent to commit a felony (see § 459) was established by other evidence in the record, to wit: when Daniel talked "stuff" to Christopher, Christopher left Maria's house,

walked about four blocks to retrieve the hammer he saw earlier on his walk with Maria and then *reentered* Maria's house with the hammer and brutally attacked Daniel.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The trial court is directed to vacate Christopher's conviction for simple mayhem because that conviction is a lesser necessarily included offense of aggravated mayhem. The trial court is also directed to amend the abstract of judgment accordingly, to delete count 4 in "box 5" of the abstract to reflect that the trial court imposed a life sentence on count 1 only, to correctly state Christopher's conviction for aggravated mayhem in violation of section 205, and to then forward the corrected abstract to California's Department of Corrections and Rehabilitation. In all other respects, Christopher's judgment of conviction is affirmed.

McDonald, J., and McIntyre, J., concurred.

On November 14, 2012, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 13, 2013, S206944.

---

*See footnote, *ante*, page 875.