Filed 6/12/25  P. v. Gaxiola CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOE MANUEL GAXIOLA,<br><br>    Defendant and Appellant. | F087845<br><br>(Super. Ct. No. 4004466)<br><br>**OPINION** |

### THE COURT*

APPEAL from an order of the Superior Court of Stanislaus County.  Kellee C. Westbrook, Judge.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Cameron M. Goodman and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*      Before Levy, Acting P. J., Peña, J. and Meehan, J.

Defendant Joe Manuel Gaxiola was convicted by a jury of attempted murder and other offenses in 1990. He was sentenced to an aggregate term of life plus two years in state prison. He filed a petition for resentencing, pursuant to former Penal Code section 1170.95[1] (now § 1172.6), based upon the changes to the felony-murder rule and the natural and probable consequences doctrine of aider and abettor liability effectuated by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). The trial court summarily denied the petition at the prima facie stage, concluding that defendant was ineligible for relief as a matter of law. On his first appeal, the parties agreed, as did we, that defendant stated a prima facie case for relief. We reversed and remanded for further proceedings.

On remand, the trial court considered defendant's statements at a parole suitability hearing in determining that defendant was ineligible for relief. On appeal, defendant contends (1) there was insufficient evidence to support the trial court's conclusion that defendant had the intent to kill because the evidence showed he used birdshot and/or buckshot shells and no evidence was admitted "establishing what it takes for such pellets to be fatal, if such pellets can ever be fatal," and (2) the court's consideration of his statement from the parole suitability hearing was error. The People disagree on both accounts. We affirm.

## PROCEDURAL SUMMARY

On January 11, 1990, the Stanislaus County District Attorney filed an information charging defendant with attempted murder (§§ 187, subd. (a), 664; count I), two counts of assault with a deadly weapon (§ 245, subd. (a)(2); counts II & III), and discharging a firearm at an inhabited dwelling (§ 246; count IV). As to count I, the information alleged that the offense was committed with premeditation and deliberation. As to counts I

---

[1] All further statutory references are to the Penal Code unless otherwise noted. Former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

2.

through III, the information further alleged that defendant personally used a firearm in the commission of the offenses (§ 12022.5).

On April 11, 1990, the jury found defendant guilty on all counts and found all special allegations true. As to count I, the jury specifically found defendant committed first degree attempted murder with premeditation and deliberation.

On May 15, 1990, the trial court sentenced defendant to an indeterminate life term plus two years as follows: on count I, an indeterminate life term, plus a two-year firearm enhancement (§ 12022.5); on counts II and III, the middle term of three years, plus a two-year firearm enhancement (§ 12022.5), both to run concurrent with the term on count I; and on count IV, the middle term of five years, to run concurrent with the term on count I.

On November 8, 1991, this court struck the firearm enhancements as to counts II and III, but affirmed in all other respects.

On April 5, 2022, defendant petitioned for resentencing pursuant to section 1172.6, arguing that he could no longer be convicted of attempted murder.

On December 9, 2022, the trial court denied defendant's petition at the prima facie stage, concluding that defendant was ineligible for relief as a matter of law.

On May 30, 2023, this court reversed the trial court's denial of defendant's petition and remanded with directions for the trial court to issue an order to show cause and conduct further proceedings required by section 1172.6.

The trial court issued an order to show cause and, on January 16, 2024, held an evidentiary hearing. At that hearing, the court considered testimony by witnesses, including defendant, as well as "the jury trial transcript, the jury verdicts, the jury instructions, the charging documents, the appellate proceedings and history, and parole hearing transcripts."

On March 22, 2024, the trial court issued a written order, summarizing the evidence it considered and denying defendant's petition.

On April 2, 2024, defendant filed a notice of appeal.

**FACTUAL SUMMARY**[2]

**1. Trial Testimony**

A. The People's Case

On July 29, 1989, Marvin Burrow, Jr., and his friend Joe Romo were moving Romo's furniture to Burrow, Jr.'s aunt's house. They planned to go to the fair when they finished with some of their other friends. While they were on their way from Burrow, Jr.'s aunt's home to Burrow, Jr.'s family home (the Burrow family home), they saw defendant driving the opposite direction; Romo and defendant exchanged unfriendly looks. They then returned to the Burrow family home.

On the same date, not long after Romo exchanged unfriendly looks with defendant, between about 5:00 p.m. and 6:00 p.m., Shelly Slivo was at the Burrow family home in Modesto with her son; her brother, Burrow, Jr.; and Romo. Defendant and Albert Barajas parked an old pickup truck painted with primer in the "middle of the street" near the home. At that time, Burrow, Jr., was going through the gate to the back yard. Barajas called to Romo and Romo walked toward defendant and Barajas to talk. As Romo approached, defendant said, " 'Let's take it to the park' " and asked Romo if he was " 'still talking s**t.' " Defendant ran toward and attempted to hit or grab Romo, and they exchanged blows. Barajas approached Romo with an aluminum baseball bat, but did not successfully strike Romo with it. Barajas may have inadvertently hit defendant with the bat. Romo hit Barajas and took the bat from him, but did not strike Barajas or defendant with it. Barajas and defendant both fought against Romo. Burrow, Jr., estimated the fight lasted between four and five minutes; Slivo estimated the fight lasted approximately 10 to 20 minutes. The fight concluded with Barajas and defendant

_____

[2] Because defendant raises only legal issues and because we do not reach the issue of prejudice, the facts underlying the offenses are only minimally relevant and we provide only a limited factual summary.

4.

running away, Romo chasing them, and a vehicle arriving with four or five people who planned to go with Burrow, Jr., and Romo to the fair. Burrow, Jr., was not involved in the fight, nor were the people who arrived at the end of the fight. Burrow, Jr., and Romo decided not to go to the fair because Slivo had called the police to report the fight.

Slivo and Burrow, Jr.'s father, Marvin Burrow, Sr., returned to the Burrow family home in Modesto with his wife Glenda, his daughter Cheryl, and his three grandchildren, including three-year-old Eric. Burrow, Jr., Romo, and Slivo were all still at the house. At dusk, approximately 30 minutes after the fistfight ended and about five minutes after Burrow, Sr., returned home, Barajas, defendant, and at least two other people returned in a metallic blue vehicle, stopped in front of the house, and exited the vehicle. Defendant held a sawed-off double-barrel shotgun[3] and pointed it at Romo. Slivo yelled, " '[h]e's got a gun.' " Burrow, Jr., and Romo saw Barajas holding a .22-caliber rifle that was "cut down." Neither Burrow, Sr., nor Slivo saw whether Barajas held a weapon. When defendant and Barajas exited the metallic blue vehicle, Burrow, Sr., was entering his front door. Romo was in front of the house, approximately 25 feet from defendant. Eric was either in the hall, approximately 22 feet from the front door, or just inside the doorway, just before the hallway. Cheryl was also in the hallway, approximately 10 feet from the front door.

As defendant fired the first shot, Romo dove toward the front door and was hit by shotgun pellets on his leg; he then grabbed Eric and ran into the kitchen. Eric was struck by a pellet on his left thigh which left a red welt; Cheryl was struck by one pellet on each foot. Burrow, Sr., was struck by three shotgun pellets on his lower body, none breaking the skin. When the first shot was fired, Burrow, Sr., "fell on the floor and stayed there," as did Slivo. Burrow, Sr., heard approximately six shots fired in total over the course of

---

[3]     Burrow, Sr., thought the gun may have been a shotgun or a rifle. Burrow, Jr., and Romo both described the gun as a double-barrel shotgun. Romo had seen the shotgun before.

approximately one minute to 90 seconds; Slivo heard 10 to 20 shots fired, approximately seven or eight of which she believed to have been fired from a shotgun and the rest she believed to have been fired from a handgun; Romo heard approximately 10 shotgun shots fired. Burrow, Jr., testified that the first two shotgun shots came in quick succession. After the shooting, Burrow, Sr., found "about 900 [pellets] in [the] hallway" of his home, some of which had appeared to have ricocheted off the open security screen door. Burrow, Sr., described the pellets found in his home as "birdshot" and "No. 8 birdshot." He further described that there was a possibility that a ".22[-caliber] round" had struck the side of the house, but he was not sure because there were also shotgun pellet holes and there had already been nail holes in the wall. Slivo did not see any marks on the house that she believed to be attributable to a shot from a pistol or rifle.

After the shooting, the metallic blue vehicle and the truck were both gone.

A technician with the Modesto Police Department collected birdshot and buckshot[4] from the kitchen and living room floors of the home, and four .22-caliber shell casings from the street in front of the home on the date of the shooting.

### B. Defendant's Case

Robert Martinez, Jr., was friends with defendant. "Toward the end of July" of 1989, defendant came to Martinez's house. He was covered in blood, his face and neck were scratched, and his nose and mouth were bleeding. Martinez went into the house to get first-aid equipment and when he came out defendant was driving away in his truck.

George McCutchan, Valerie Morillo, and Tom Rhea were neighbors to Romo. On March 17, 1989, McCutchan had been drinking alcohol and went to Romo's home. Romo and his friends were there. McCutchan testified that Romo beat him up on that date, but also that he did not remember much of what happened and could not say

---

**4** The technician referred to birdshot and buckshot in different portions of his testimony. He testified to having collected birdshot from the interior of the house and having observed buckshot on the ground near the kitchen and living room.

whether Romo had hit him. Another witness to that fight testified that someone struck McCutchan with a shovel during the fight. McCutchan was taken from the Burrow family home by ambulance.[5] In January 1989, Romo threatened Morillo and the following day nearly struck her with his truck. In September 1988, Romo challenged Rhea to fight. Rhea declined and they did not fight.

Darius Scott owned the metallic blue vehicle used in the shooting. In late July 1989, police officers stopped him while he was driving his vehicle. Barajas's brother was in the car with him. He had not let anyone use his car. Neither defendant nor Barajas had been in his vehicle. There was a .22-caliber magazine in Scott's car when he was stopped by law enforcement. It belonged to one of his father's rifles.

**2. Parole Suitability Hearing Testimony**

Defendant testified under oath at parole suitability hearings starting in 1999. The trial court considered excerpts from those hearings. The following are summaries of the excerpts relevant to this appeal.

A. The 1999 Parole Suitability Hearing

On December 1, 1999, defendant testified under oath at his parole suitability hearing.

Defendant testified that Romo and others had "beat up" or "jumped" Barajas's younger brother. Barajas had asked defendant for support to make sure that when he confronted Romo he would not be "jumped" by multiple people. After visiting a friend near what he believed to be Romo's home, Barajas and defendant saw Romo and eventually Barajas fought Romo. While they were fighting, two cars arrived and helped Romo "jump" Barajas and defendant. Barajas and Romo fled, leaving defendant's truck.

---

[5] The witness who testified to seeing McCutchan struck by a shovel believed he was "taken by a police van in handcuffs."

Defendant's nephew, Alex Espinoza, drove defendant and Barajas back to the home, which defendant still believed to be Romo's home, to retrieve defendant's truck. Defendant got out of Espinoza's car with a firearm. Romo "jumped out," defendant "panicked," and defendant shot at the home. Defendant denied shooting at Romo; he "just shot at the house." Defendant acknowledged that Romo and another man were "already running in the house" as he shot. Defendant denied shooting "numerous times"; he shot only once. He "was[ not] trying to kill" anyone.

### B.  The 2002 Parole Suitability Hearing

On October 1, 2002, defendant testified under oath at his parole suitability hearing.

Defendant and Barajas were "jumped" by several people at the Burrow family home. As a result, defendant had to leave his truck. When he returned for his truck, he had "to take some protection for [his] safety."

Defendant denied having shot anyone. Defendant acknowledged he had a shotgun when he went to the Burrow family home but testified that only Barajas shot. The birdshot found in the house were fired from Barajas's .22-caliber rifle. Defendant fired the shotgun in the air, but he did not shoot at anyone. He shot because a "guy jumped up" and he "panicked."

### C.  The 2008 Parole Suitability Hearing

On February 6, 2008, defendant testified under oath at his parole suitability hearing.

Defendant did not shoot at anyone or try to kill anyone. He went to the Burrow family home to retrieve his truck.

### 3.  Section 1172.6 Evidentiary Hearing Testimony

On July 29, 1989, Modesto Police Officer James Johnson was a detective in the gang unit. On August 1, 1989, he searched the vehicle that Espinoza, who drove defendant and Barajas to the Burrow house on July 29, 1989, claimed to own. He

8.

discovered four .22-caliber rifle rounds on the center console of the vehicle; and in the trunk, "an empty box of Winchester Quail and Dove loads," in other words, birdshot for a shotgun. The .22-caliber rifle rounds were not " 'snake shot' " or " 'rat shot' " ammunition, containing pellets.

Barajas testified that in July 1989, he and defendant were involved in a confrontation with Romo at the Burrow family home. They arrived at the home in defendant's truck. They fled and left the truck behind when seven or eight people came out of the home.

Roughly 45 minutes later, at dusk, he and defendant returned to the Burrow family home with Espinoza and Raymond Camacho to pick up defendant's truck. When they arrived, between six and eight people were in front of the home and Barajas shot three or four shots in the air with a "sawed-off .22[-caliber]" rifle. Prior to shooting, he had the rifle concealed on his person and did not tell defendant he was carrying it. He fired "normal .22[-caliber] bullets." When he fired, Romo ran into the house. He did not remember seeing anyone else with a firearm. He did not see defendant with a gun at any point that day and did not see anyone else fire any shots. He did not hear anyone fire a shotgun.

Prior to Romo's testimony at trial, Barajas's girlfriend spoke to Romo to encourage him to blame defendant instead of Barajas.

On July 29, 1989, Donna Franco saw "the Romos" (perhaps Romo and three other people) shooting at Barajas and defendant.[6] Barajas was shooting back, but defendant was not involved; defendant was sitting in his truck. Franco did not see defendant with a

---

[6] Franco also testified that she did not see the people with Romo armed with any weapons. She later also testified that she "did[ not] see anything in … Romo's hand. [She] heard shooting from his house going towards" defendant and Barajas. She testified she heard multiple guns fire from the Burrow family home. She then saw Barajas return fire.

gun on July 29, 1989.  Two people chased defendant and Barajas and they fled, leaving defendant's truck.  Franco did not see defendant again that day.  Defendant's truck remained where it was left all night.

Prior to Franco's testimony at trial, Barajas's girlfriend contacted Franco and asked her to "say [defendant] had something to do with it."

## DISCUSSION

Defendant contends that (1) the trial court's finding that defendant remained liable for attempted murder was not supported by sufficient evidence and (2) the court's admission and consideration of defendant's parole suitability hearing testimony was error because (a) the statement was subject to the doctrine of use immunity and its introduction therefore violated defendant's federal and state constitutional rights against self-incrimination and (b) it constituted an involuntary confession that should have been excluded under the due process clauses of the state and federal constitutions.  Defendant further contends, insofar as his second claim was forfeited for failure to object below, his trial counsel was ineffective in failing to object.  Both arguments fail on their merits.

### 1. Statutory Background

Effective January 1, 2019, Senate Bill 1437 limited accomplice liability under the felony-murder rule[7] and the natural and probable consequences doctrine.[8]  (§§ 188, 189,

---

[7]    Prior to Senate Bill 1437's enactment, " '[t]he felony-murder rule impute[d] the requisite malice for a murder conviction to those who commit[ted] a homicide during the perpetration of a felony inherently dangerous to human life.' " (*People v. Friend* (2009) 47 Cal.4th 1, 76.)

[8]    Prior to Senate Bill 1437's enactment, " ' "[a] person who knowingly aid[ed] and abet[ted] criminal conduct [was] guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commit[ted] [nontarget offense] that [was] a natural and probable consequence of the intended crime." ' " (*People v. Chiu* (2014) 59 Cal.4th 155, 161.)  " ' "[B]ecause the nontarget offense [was] unintended, the mens rea of the aider and abettor with respect to that offense [was] irrelevant and culpability [was] imposed simply because a reasonable person could have foreseen the

as amended by Stats. 2018, ch. 1015, §§ 2–3; *People v. Cruz* (2020) 46 Cal.App.5th 740, 755; *Lamoureux*, *supra*, 42 Cal.App.5th at p. 246.) The Legislature's purpose was " 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant of the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) [Senate Bill 1437] achieves these goals by amending section 188 to require that a principal act with express or implied malice and by amending section 189 to state that a person can only be liable for felony murder if (1) the 'person was the actual killer'; (2) the person was an aider or abettor in the commission of murder in the first degree; or (3) the 'person was a major participant in the underl[y]ing felony and acted with reckless indifference to human life.' " (*People v. Cornelius* (2020) 44 Cal.App.5th 54, 57, abrogated on other grounds in *People v. Lewis* (2021) 11 Cal.5th 952, 961–962.)

"Senate Bill 1437 also [added former section 1170.95, now section 1172.6, which] established a procedure permitting certain qualifying persons who were previously convicted of felony murder or murder under the natural and probable consequences doctrine to petition the courts that sentenced them to vacate their murder convictions and obtain resentencing on any remaining counts." (*Lamoureux*, *supra*, 42 Cal.App.5th at p. 246; former § 1170.95, added by Stats. 2018, ch. 1015, § 4, renumbered by Stats. 2022, ch. 58, § 10, now § 1172.6.) Under that procedure, a convicted person is eligible for relief if the following conditions are met: "(1) A complaint, information, or indictment was filed against the [defendant] that allowed the prosecution to proceed under a theory of felony murder [or] murder under the natural and probable consequences doctrine .… [¶] (2) The [defendant] was convicted of murder … following a trial or accepted a plea offer in lieu of a trial at which the [defendant] could have been convicted of murder. [¶]

---

commission of the nontarget crime." ' " (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 248 (*Lamoureux*).)

(3) The [defendant] could not presently be convicted of murder … because of [the] changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)–(3).)

Under that procedure, once a defendant has made a prima facie case for relief, the trial court is required to issue an order to show cause and hold an evidentiary hearing at which the People bear the burden of proving beyond a reasonable doubt that defendant could be convicted of murder or attempted murder under the law "as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subds. (c), (d)(1) & (3).) At the hearing, "admission of evidence in the hearing [is] governed by the Evidence Code"[9] and "[t]he prosecutor and the [defendant] may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).) In determining whether a prosecutor has met their burden, the court sits as an independent trier of fact. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123; *People v. Schell* (2022) 84 Cal.App.5th 437, 442.)

### 2. Sufficiency of the Evidence

Defendant contends that insufficient evidence was presented for the trial court to find that he could still be convicted of attempted murder. Specifically, he argues his use of birdshot (and/or buckshot) shells in shooting at Romo indicated that he lacked the intent to kill. The People disagree, arguing that defendant having fired "at least 900 birdshot pellets at" Romo was sufficient evidence for the court to have inferred that defendant intended to kill Romo. We agree with the People.

---

[9] Section 1172.6, subdivision (d)(3) creates an exception to the general Evidence Code rules for admission of "evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed."

12.

A. Standard of Review

On appeal from the denial of a section 1172.6 petition following an evidentiary hearing, we review the trial court's findings for substantial evidence. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) We accept the court's determinations on witness credibility and evidentiary conflicts, along with any logical inferences it may have drawn from the evidence. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 479; *People v. Didyavong* (2023) 90 Cal.App.5th 85, 97.) And we "review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *Didyavong*, at pp. 97–98.)

We will not reverse the trial court's decision unless there is no hypothesis upon which sufficient substantial evidence exists to support it. (*People v. Didyavong*, *supra*, 90 Cal.App.5th at p. 97.)

B. Analysis

At the time of defendant's conviction, the law allowed him to be convicted of attempted murder under the natural and probable consequences doctrine, i.e., on a theory that he participated in a group assault, the natural and probable consequence of which was attempted murder committed by one of the coparticipants in that assault. (See, e.g., *People v. Montes* (2021) 71 Cal.App.5th 1001 [the defendant was convicted of attempted murder based on his participation in the target offense of assault "because the perpetrator … intended to kill and the perpetrator's attempted murder was a natural and probable consequence of [the] assault"].) The new law, however, eliminates such a theory. Now, the People are required to prove that defendant himself harbored the requisite mental state for attempted murder—express malice. (See *People v. Smith* (2005) 37 Cal.4th 733, 741 [the mental state required for attempted murder is "intent to kill or express malice"].) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.] … Express malice requires a showing that the assailant ' " 'either desire[s]

13.

the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' " ' " (*Smith*, at p. 739.)

"Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

Defendant contends the evidence of intent to kill was insufficient and the evidence supported only that defendant committed assault with a deadly weapon from which the intent to commit murder cannot be inferred. He is correct that a factfinder cannot *presume* an intent to kill merely from the commission of an assault with a deadly weapon. (*People v. Belton* (1980) 105 Cal.App.3d 376, 381 citing *People v. Snyder* (1940) 15 Cal.2d 706, 708.) However, in the light most favorable to the judgment, the evidence presented at trial reasonably supported an inference that defendant intended to kill Romo. The evidence presented at trial was that defendant had gotten into a fight with Romo, resulting in defendant running away. About 30 minutes later, defendant returned armed with a shotgun and, while standing 25 feet from Romo, pointed a shotgun at Romo, fired, and hit Romo on the leg with the first shot. After Romo fled into the Burrow family home, defendant continued to fire. Approximately 900 pellets, described both as "birdshot" and "buckshot" were found in the Burrow family home after the shooting.

Even assuming defendant fired only birdshot, evidence that a defendant fired birdshot at a person—absent any expert testimony regarding lethality of such a shotgun load—is sufficient for a finder of fact to infer intent to kill. (*People v. Serrano* (2024) 100 Cal.App.5th 1324, 1334–1335.) In *Serrano*, after fleeing from law enforcement, the defendant crashed a stolen vehicle. (*Id.* at p. 1331.) He exited and aimed a shotgun at the vehicle of the first officer to arrive at the intersection where the crash had occurred. (*Ibid.*) The defendant shot the officer who was still seated in his vehicle with a birdshot load. (*Id.* at pp. 1331, 1335.) A second officer arrived as the defendant fired his first shot. (*Ibid.*) The defendant fired "across the street" at the second officer. (*Id.* at

14.

p. 1335.) In total the defendant fired four times at the officers. (*Id*. at pp. 1331–1332, 1335.) On appeal, the defendant challenged whether the evidence was sufficient to support the premeditation and deliberation findings for his two convictions of attempted premeditated murder of a peace officer. (*Id*. at p. 1333.) The court of appeal explained that the "requisite state of mind for premeditation and deliberation … ' "requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." ' " (*Ibid*.) The court concluded, "it [was] difficult to imagine a scenario where a defendant repeatedly racks a firearm to prepare a shell for firing, takes aim, and then fires toward two people *without* harboring the intent to kill them." (*Id*. at p. 1335.) We agree with the *Serrano* court.

In this case, defendant aimed at Romo, fired, struck Romo with the first shot as Romo fled, fired again quickly after the first shot, and continued to fire at least four additional times. From that evidence, a reasonable finder of fact could reasonably have concluded beyond a reasonable doubt that defendant had the intent to kill Romo. The fact that defendant appears only to have hit Romo with the first shot and did not cause Romo serious injury does not undermine our conclusion. (*People v. Smith*, *supra*, 37 Cal.4th at p. 742 ["that the bullet misses its mark or fails to prove lethal" is not "dispositive—the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill"].)[10]

---

**10** We do not reach the People's alternative argument that the trial court could reasonably have found defendant guilty on an aider and abettor theory of liability. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 892, fn. 22 ["Because we affirm [the] defendant's conviction for attempted murder and assault with a firearm on the theory that he was the actual perpetrator of those crimes, we need not consider whether the evidence is sufficient to convict him of those crimes under an alternative theory of liability."].)

### 3. Parole Suitability Hearing Statements

Defendant contends his parole suitability hearing testimony should not have been admitted because (1) it was subject to use immunity protection pursuant to *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*) and (2) defendants are subject to "heavy pressure to provide self-incriminating testimony" at parole suitability hearings such that the testimony given at those hearings "cannot be considered voluntary." The People disagree on both accounts as do we.

Defendant also argues, insofar as his arguments are forfeited, the forfeiture constituted ineffective assistance of counsel. While defendant failed to object on the basis that admission of the parole suitability hearing transcripts would constitute an involuntary confession, we nevertheless exercise our discretion to consider the issues on their merits.

#### A. Forfeiture

At the evidentiary hearing on defendant's section 1172.6 petition, defendant objected to admission of the parole suitability hearing transcript excerpts on the basis that the statements fell within the use immunity doctrine. No objection was raised that admission of the transcript constituted admission of an involuntary confession in violation of the due process clauses of the state and federal constitutions.

The failure to object to admission of evidence in the trial court generally forfeits a claim on appeal; a principle applicable to constitutional claims. (*People v. Myles* (2021) 69 Cal.App.5th 688, 696 (*Myles*); *People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) Defendant did not raise an objection to admission of the parole suitability hearing transcript excerpts on the basis that it constituted an involuntary confession. However, because defendant contends, assuming the issue is forfeited, his counsel was ineffective in failing to raise the issue below, we exercise our discretion to reach the merits of his claim to forestall the claim of ineffective assistance of counsel. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [an

16.

appellate court has authority to reach a forfeited claim]; *People v. Crittenden* (1994) 9 Cal.4th 83, 146 [reviewing court may exercise discretion to consider forfeited claims to forestall ineffective assistance of counsel arguments].)

### B. Use Immunity

Defendant contends the admission of his statements to the parole board violated his state and federal due process rights under the use immunity doctrine. We disagree.

Use immunity is a judicial rule of evidence that effectuates the privilege against self-incrimination. (*Coleman*, *supra*, 13 Cal.3d at pp. 875, 889.) In *Coleman*, the defendant's criminal act was charged both as a violation of the defendant's then-current probation and a separate criminal act. The defendant testified at his probation violation hearing and the People subsequently sought to use that testimony in their case-in-chief at the defendant's trial. Our Supreme Court held that the testimony was inadmissible: "[T]he testimony of a probationer at a probation revocation hearing held prior to the disposition of criminal charges arising out of the alleged violation of the conditions of his probation, and any evidence derived from such testimony, is inadmissible against the probationer during subsequent proceedings on the related criminal charges." (*Id.* at p. 889.)

The Supreme Court's holding rested on two "policies underlying the privilege against self-incrimination." (*Coleman*, *supra*, 13 Cal.3d at p. 875.) First, permitting prosecutors to use a defendant's probation revocation testimony to prove guilt at a subsequent trial for the same conduct would "substantially lighten[]" the People's constitutional burden of proof. (*Id.* at p. 876.) This is because, ordinarily, "the privilege against self-incrimination requires the prosecution in a criminal trial to produce sufficient evidence to establish the defendant's guilt before he must decide whether to remain silent or to testify in his own behalf." (*Id.* at p. 875, italics omitted.)

Second, permitting prosecutors to use such testimony would force the defendant to choose between (1) testifying truthfully at the probation revocation hearing and possibly

17.

incriminating himself or herself while presenting any mitigating circumstances regarding the violation, (2) remaining silent at the probation revocation hearing and losing the opportunity to present a potentially compelling case against probation revocation, or (3) testifying falsely at the probation revocation hearing in a manner that will not damage his defense at a subsequent trial.  (*Coleman*, *supra*, 13 Cal.3d at p. 878.)  "Thus, when an alleged probation violation also constitutes a criminal offense for which the probationer might subsequently be prosecuted, he may be presented with the 'cruel trilemma' of self-accusation, perjury or injurious silence.  To force an individual to choose one of three such unpalatable alternatives runs counter to our historic aversion to cruelty reflected in the privilege against self-incrimination."  (*Ibid*.)

Several Courts of Appeal have declined to extend the rationale of *Coleman* to prohibit the use of parole hearing transcripts at section 1172.6 evidentiary hearings.  In *Myles*, the Court of Appeal pointed out that the Fifth Amendment privilege against self-incrimination protects persons from being compelled to serve as a witness against themselves in " ' "any criminal case." ' "  (*Myles*, *supra*, 69 Cal.App.5th at p. 705, italics omitted.)  However, a section 1172.6 evidentiary hearing is not a trial de novo but an act of lenity extended to defendants already serving a valid sentence for murder.  Accordingly, the *Myles* court held the use of parole hearing statements in such proceedings does not violate the defendant's Fifth Amendment rights.  (*Myles*, at pp. 705–706.)

In *People v. Duran* (2022) 84 Cal.App.5th 920 (*Duran*), the Court of Appeal noted that "cases applying *Coleman*'s use immunity are … limited to situations where a defendant's prior statements might be later used against him *in a manner that offends the privilege against self-incrimination*."  (*Duran*, at p. 929 [collecting cases].)  The court determined there were two reasons why "this brand of use immunity does not apply to bar the use of a defendant's prior statements in a parole risk assessment at a subsequent section 1172.6 evidentiary hearing."  (*Id*. at p. 930.)  First, because the section 1172.6

evidentiary hearing is not a " 'criminal case' " or " 'cause,' " it does not implicate the privilege against self-incrimination. (*Duran*, at p. 930.) "Once a defendant's 'sentence has been fixed and the judgment of conviction has become final,' the 'general rule' is that 'there can be no further incrimination' and hence 'no basis for the assertion of the privilege.' " (*Ibid*.) Because the section 1172.6 hearing is itself neither a subsequent retrial nor a new sentencing, "*Coleman*'s core rationale—and hence its holding—is not implicated." (*Duran*, at p. 931.) Second, the *Duran* court noted that *Coleman* made clear that use immunity "does not apply when a defendant's prior statements are to be introduced 'for purposes of impeachment' because the privilege against self-incrimination 'does not … encompass a right of an accused to lie.' " (*Duran*, at p. 931.) Thus, even assuming *Coleman* applied, the court would have held the parole risk assessment admissible, to the extent it was inconsistent with the defendant's sworn declaration, filed with his petition, that he was qualified to be resentenced because his conviction was invalid under the amended murder statutes. (*Duran*, at pp. 931–932.)

Other courts have reached similar conclusions. (*People v. Zavala* (2024) 105 Cal.App.5th 366, 376; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 588–590 (*Mitchell*) [declining to equate the § 1172.6 evidentiary hearing with a criminal prosecution for purposes of use immunity]; *People v. Anderson* (2022) 78 Cal.App.5th 81, 88–93 [rejecting the argument that *Coleman* use immunity is not predicated on the constitutional privilege against self-incrimination]; but see *Mitchell*, at pp. 602–605 (dis. opn. of Stratton, P. J.) [Coleman is not limited to the privilege against self-incrimination and applies if the use of prior testimony would be fundamentally unfair].) Defendant cites no cases to the contrary in this context. He simply notes our Supreme Court has not yet decided the issue and argues that the appellate cases we cite were incorrectly decided.

Defendant does not provide a compelling justification for deviating from the holding that the Fifth Amendment privilege against self-incrimination does not apply to the section 1172.6 evidentiary hearing. He merely points out that, in this context, the

prosecution's burden of proof at the evidentiary hearing is beyond a reasonable doubt. However, that burden is statutory rather than constitutionally imposed. Furthermore, as the *Duran* court pointed out, a defendant's conviction remains intact and presumptively authorized during the pendency of the hearing. (*Duran*, *supra*, 84 Cal.App.5th at p. 931.) While defendant is correct that defendant's own statements from a parole hearing can have adverse consequences for a section 1172.6 petition, those consequences would not be new; failure of the petition would result in defendant's conviction and sentence staying intact.[11] It is for this reason that "the panoply of rights that attach at trial do *not* apply during a section 1172.6 evidentiary hearing." (*Duran*, at p. 931.)

Accordingly, we join other courts that have considered this issue and hold that *Coleman*'s use immunity does not extend to exclude defendant's parole hearing testimony from the section 1172.6 evidentiary hearing.

### C. Involuntary Confession

The due process clauses of "[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176; accord, *People v. Orozco* (2019) 32 Cal.App.5th 802, 819.) A coerced or involuntary confession is inadmissible for any purpose. (*People v. Jimenez* (2021) 73 Cal.App.5th 862, 875–876.) " ' "The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' " (*Linton*, at p. 1176.) " 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' [Citation.] 'Whether a confession was voluntary depends upon

---

[11]    The *Mitchell* court correctly noted: "A petition under … section [1172.6] is not a criminal prosecution. [Citation.] It is the *opposite* of a criminal prosecution. A criminal prosecution can only hurt a defendant and can never help. The process here is the reverse: it can only help the defendant and can never hurt." (*Mitchell*, *supra*, 81 Cal.App.5th at p. 588.)

the totality of the circumstances.' " (*Ibid*.) We independently review a trial court's legal determination regarding voluntariness where the facts surrounding an admission or confession are recorded and therefore not subject to dispute. (*Id*. at pp. 1176–1177.)

In *Myles*, the Court of Appeal addressed the voluntariness of the defendant's statements at a parole hearing while considering her argument that the statements were entitled to use immunity. (*Myles*, *supra*, 69 Cal.App.5th at pp. 705–706.) The court noted that the defendant was not required to testify at her parole hearing, inasmuch as "parole cannot be conditioned on admission of guilt to a certain version of the crime." (*Id*. at p. 706, citing § 5011, subd. (b); Cal. Code Regs., tit. 15, § 2236; *In re Swanigan* (2015) 240 Cal.App.4th 1, 14; and *In re McDonald* (2010) 189 Cal.App.4th 1008, 1023.) Furthermore, the defendant was advised at the parole hearing that she had the option to not discuss the commitment offense, and that choice would not be held against her. (*Myles*, at p. 706.) However, she chose to discuss the offense and testified under oath regarding her role in the crime. (*Ibid.*) "Having chosen to be truthful in the assessment interview and testify truthfully at the parole hearing, it is not fundamentally unfair to admit that information during a resentencing proceeding voluntarily initiated by [the] defendant bearing on some of the same issues." (*Myles*, at p. 706; accord, *People v. Zavala*, *supra*, 105 Cal.App.5th at p. 373 [parole suitability hearing testimony is admissible at section 1172.6 evidentiary hearings].)

Defendant contends that *Myles* and *Zavala* were wrongly decided. We disagree.

Here, defendant contends in general that parole hearings are coercive because "the grant of parole is, realistically, … dependent [up]on acceptance of responsibility." Defendant argues that testimony before the parole board must display insight into the life crime, "be 'unflinchingly self-critical,' " and "avoid shifting blame for the offense" to avoid being denied parole because an inmate "shows an unreasonable risk to public safety." In that way, defendant argues, the incentives at a parole suitability hearing are at odds with a section 1172.6 proceeding. (See also Cal. Code Regs., tit. 15, § 2281,

subd. (d) [remorse and eight other factors are circumstances tending to show the defendant is suitable for release on parole].)  However, we note that a refusal to discuss the facts of a life crime cannot be held against a defendant:  "[a defendant] may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the [defendant]." (Cal. Code Regs., tit. 15, § 2236; see § 5011, subd. (b) ["The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."].)  That a defendant may have had an incentive to admit having committed the offenses of conviction does not suggest his will was overborne by official coercion, such that his statements were involuntary.

As a general matter, despite the "incentives facing people seeking parole," "[t]here is no categorical exclusion of a defendant's sworn parole hearing testimony in [the section 1172.6 petition] process." (*Mitchell*, *supra*, 81 Cal.App.5th at p. 586.)  As the court pointed out in *Myles*, an inmate is not required to testify at his parole hearing. (*Myles*, *supra*, 69 Cal.App.5th at p. 706.)  In the excerpts from the 1999, 2005, 2008, and 2021 parole suitability hearings in this case, a commissioner either told defendant that he was not required to talk about his life crime or asked him if he wanted to talk about his life crime.  Defendant declined to discuss the details of his life crime in the 2005, 2008 and 2021 hearings.  When he declined to do so at his 2008 parole suitability hearing, a commissioner responded, "[t]hat's your right to do so, and it certainly won't be weighed negatively toward you at all."  The record thus reflects that defendant was aware of his right to refrain from testifying in whole or in part and exercised that right at least three times.

Moreover, none of the commissioners in any of the excerpts from the parole suitability hearings promised defendant release in exchange for admission of particular facts.  (Cf. *People v. Gonzalez* (2012) 210 Cal.App.4th 875, 881, 884 [statement by parole agent that if defendant did not agree to speak with officers, parole agent would be

forced to recommend that defendant serve maximum time in custody, knowing defendant feared returning to prison, rendered defendant's confession involuntary].) Rather, in each instance that defendant elected to testify, defendant was sworn to tell the truth. (See *Mitchell*, *supra*, 81 Cal.App.5th at p. 590 ["[t]he parole process emphasizes the importance of voluntary, unvarnished truthtelling"].) Defendant's contention that "the grant of parole is, realistically, … dependent [up]on acceptance of responsibility," does not suggest that his testimony was involuntary. Defendant was aware of and exercised his right not to speak to the board at least three times.

The totality of these circumstances does not suggest that defendant's parole board hearing testimony was involuntary or coerced. Accordingly, the trial court did not err in admitting defendant's statements from the parole hearing transcripts. We therefore do not address the parties' arguments regarding whether admission of this testimony was prejudicial and whether defendant's trial counsel was ineffective.

## **DISPOSITION**

The order is affirmed.